**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 29, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA, on its own behalf and on behalf of the Pueblos of Jemez, Santa Ana, and ZIA,

     Plaintiff - Appellant,

STATE OF NEW MEXICO, ex rel. State Engineer; JEMEZ RIVER BASIN WATER USERS COALITION,

     Plaintiffs - Appellees,

and

PUEBLO OF SANTA ANA; PUEBLO OF JEMEZ; PUEBLO OF ZIA,

     Plaintiff Intervenors,

v.

TOM ABOUSELMAN; DARWIN HOURIGAN; BOARD OF EDUCATION OF THE JEMEZ VALLEY PUBLIC SCHOOL DISTRICT; KING BROTHERS; NACIMIENTO COMMUNITY DITCH ASSOCIATION; PUBLIC LANDS COMMISSIONER,

     Defendants.----------------------------

ALL PUEBLO COUNCIL OF GOVERNORS; PUEBLO OF ACOMA; PUEBLO OF ISLETA; PUEBLO OF SANDIA; PUEBLO OF LAGUNA; PUEBLO OF SAN FELIPE; PUEBLO OF

No. 18-2164

SANTO DOMINGO; PUEBLO OF ZUNI; PUEBLO OF SANTA CLARA; PUEBLO OF OHKAY OWINGEH; ASSOCIATION OF COMMUNITY DITCHES OF RIO SAN JOSE; TRI-STATE GENERATION AND TRANSMISSION ASSOCIATION, INC; EL RITO DITCH ASSOCIATION; LA ASOCIACION DE LAS ACQUIAS DEL RIO VALLECITOS, TUSAS Y OJO CALIENTE; RIO CHAMA ACQUIA ASSOCIATION; ASOCIACION DE ACQUITAS NORTENAS DE RIO ARRIBA; LA ACEQUIA DE LA SIERRA; RIO QUEMADO, RIO FRIJOLES, RIO EN MEDIO AND SANTA CRUZ STEAM SYSTEMS COMMUNITY DITCH ASSOCIATION,

     Amici Curiae.

_____

STATE OF NEW MEXICO, ex rel. State Engineer; JEMEZ RIVER BASIN WATER USERS COALITION,

     Plaintiffs - Appellees,

UNITED STATES OF AMERICA, on its own behalf and on behalf of the Pueblos of Jemez, Santa Ana, and ZIA,

     Plaintiff,

PUEBLO OF JEMEZ; PUEBLO OF SANTA ANA; PUEBLO OF ZIA,

     Plaintiff Intervenors - Appellants,

v.

TOM ABOUSELMAN; DARWIN HOURIGAN; BOARD OF EDUCATION

No. 18-2167

OF THE JEMEZ VALLEY PUBLIC
SCHOOL DISTRICT; KING BROTHERS;
NACIMIENTO COMMUNITY DITCH
ASSOCIATION; PUBLIC LANDS
COMMISSIONER,

     Defendants.

ALL PUEBLO COUNCIL OF
GOVERNORS; PUEBLO OF ACOMA;
PUEBLO OF ISLETA; PUEBLO OF
LAGUNA; PUEBLO OF OHKAY
OWINGEH; PUEBLO OF SAN FELIPE;
PUEBLO OF SANDIA; PUEBLO OF
SANTA CLARA; PUEBLO OF SANTO
DOMINGO; PUEBLO OF ZUNI;
ASSOCIATION OF COMMUNITY
DITCHES OF RIO SAN JOSE; TRI-
STATE GENERATION AND
TRANSMISSION ASSOCIATION, INC.;
EL RITO DITCH ASSOCIATION; LA
ASOCIACION DE LAS ACEQUIAS DEL
RIO VALLECITOS, TUSAS Y OJO
CALIENTE; RIO CHAMA ACEQUIA
ASSOCIATION; ASOCIACION DE
ACQQUIAS NORTENAS DE RIO
ARRIBA; LA ACEQUIA DE LA
SIERRA; RIO QUEMADO, RIO
FRIJOLES, RIO EN MEDIO AND
SANTA CRUZ STREAM SYSTEMS'
COMMUNITY DITCH ASSOCIATION,

     Amici Curiae.

_____

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 6:83-CV-01041-MV-JHR)**

_____

Mary Gabrielle Sprague, Attorney, Department of Justice (Jeffrey Bossert Clark,
Assistant Attorney General; Eric Grant, Deputy Assistant Attorney General; Elizabeth

3

Ann Peterson, Attorney; William B. Lazarus, Attorney; James B. Cooney, Attorney, with her on briefs), Washington, D.C., for Plaintiff-Appellant United States of America.

Richard W. Hughes, Rothstein Donatelli LLP (Reed C. Bienvenu, Rothstein Donatelli LLP; David R. Yepa, VanAmberg, Rogers, Yepa, Abeita & Gomez, LLP, Albuquerque, N.M.; Joseph D. Little, Zia Pueblo, N.M., with him on briefs), Santa Fe, N.M. for Plaintiffs Intervenors-Appellants Pueblo of Jemez, Pueblo of Santa Ana, and Pueblo of Zia.

Arianne Singer, Special Assistant Attorney General, Office of the State Engineer (Gregory C. Ridgley, Special Assistant Attorney General, Office of the State Engineer; Brett J. Olsen, Special Assistant Attorney General, Abramowitz, Frank & Olsen, LLC, Albuquerque, N.M., with her on brief), Santa Fe, N.M., for Plaintiff-Appellee the State of New Mexico.

Larry C. White (John W. Utton, Utton & Kery, PA, with him on brief), Santa Fe, N.M. for Plaintiff-Appellee Jemez River Basin Water Users Coalition.

Reid Peyton Chambers and Vanessa Ray Hodge, Sonosky, Chambers, Sachse, Mielke and Brownell, L.L.P., Albuquerque, N.M.; Ann Berkley Rodgers and Peter C. Chestnut, Chestnut Law Offices, P.A., Albuquerque, N.M.; Susan G. Jordan, Jordan Law Firm L.L.C., Santa Fe, N.M.; Jane Marx, Albuquerque, N.M.; Jessica R. Aberly, Aberly Law Firm, Albuquerque, N.M.; and Scott W. Williams, Curtis G. Berkey, and Aviva L. Simon, Berkey Williams LLP, Berkeley, CA, filed an amicus curiae brief for All Pueblo Council of Governors; Pueblo of Acoma; Pueblo of Isleta; Pueblo of Sandia; Pueblo of Laguna; Pueblo of San Felipe; Pueblo of Santo Domingo; Pueblo of Zuni; Pueblo of Santa Clara; and Pueblo of Ohkay Owingeh on behalf of Plaintiff-Appellant and Plaintiffs Intervenors-Appellants.

Mary E. Humphrey and Connie Odé, Humphrey & Odé, P.C., El Prado, N.M.; Seth Fullerton, Katz, Herdman, MacGillivray & Fullerton, PC, Santa Fe, N.M.; and Adán E. Trujillo, Chimayó, N.M. filed an amicus curiae brief for El Rito Ditch Association; La Asociación de Las Acequias del Rio Vallecitos; Tusas y Ojo Caliente; Rio Chama Acequia Association; Asociación de Acequias Norteñas de Rio Arriba; La Acequia de la Sierra; and Rio Quemado, Rio Frijoles, Rio En Medio and Santa Cruz Steam Systems' Community Ditch Association on behalf of Plaintiffs-Appellees.

Sunny J, Nixon and Shannon M. Sherrell, Rodey, Dickason, Sloan, Akin & Robb, P.A., Santa Fe, N.M., and Rebecca Dempsey, Cuddy & McCarthy, LLP, Santa Fe, N.M., filed an amicus curiae brief for Tri-State Generation and Transmission Association, Inc. and Association of Community Ditches of the Rio San José on behalf of Plaintiffs-Appellees.

_____

Before **TYMKOVICH**, Chief Judge, **EBEL**, and **HARTZ**, Circuit Judges.
_____

**EBEL**, Circuit Judge.
_____

The Pueblos of Jemez, Santa Ana, and Zia have resided along the Jemez River in northern New Mexico since time immemorial; they resided there as their lands passed from Spanish sovereignty, to Mexican sovereignty, and finally to the United States. Almost forty years ago, the United States initiated a water-rights adjudication for the Jemez River Basin, claiming water rights on behalf of the Pueblos. Before us today is an interlocutory appeal addressing a discrete purely legal issue from that ongoing, decades-long litigation: "[W]hether the Pueblos' aboriginal water rights were extinguished by the imposition of Spanish authority without any affirmative act." (App'x 276.)

Exercising our jurisdiction under 28 U.S.C. § 1292(b), we hold that a sovereign must affirmatively act to extinguish aboriginal water rights. Therefore, we REVERSE the district court's determination below and REMAND the case for further proceedings consistent with this opinion.

## I.    PROCEDURAL HISTORY

These are consolidated interlocutory appeals from a district court order determining a single issue within a thirty-seven-year-old case. The appellants are the Pueblos of Jemez, Santa Ana, and Zia ("the Pueblos"), as well as the United States,

5

on its own behalf and on behalf of the Pueblos (collectively "Appellants").[1]  The

appellees are the Jemez River Basin Water Users' Coalition ("the Coalition") and the

State of New Mexico (collectively "Appellees").

This case originated in federal district court in 1983 as an action to allocate

water rights in the Jemez River in New Mexico.  This litigation presents a myriad of

issues, most of which have not yet been resolved by the district court as they are

being litigated in stages.  For the first stage, each side engaged their own expert on

Spanish law, both of whom drafted reports and testified at a three-day evidentiary

hearing in front of the magistrate judge.  The magistrate judge made proposed

findings of fact and issued a recommended disposition, which the district court

adopted.  The court found that the Pueblos had aboriginal water rights; however, it

went on to conclude that the Pueblos' aboriginal water rights were extinguished by

Spain's assertion of sovereignty over the region in the 1500s.  Because this was a

critical ruling that would dispose of many of the remaining issues in this case, the

parties requested and the district court agreed to certify that discrete issue to us for

interlocutory appeal.

## II.    JURISDICTION

The United States and the Pueblos followed the proper procedure to invoke

this court's jurisdiction under 28 U.S.C. § 1292(b), which permits interlocutory

---

[1] The United States and the Pueblos separately petitioned this court for review; both petitions were granted, and the cases were consolidated into one.  The case below is currently stayed pending the outcome of this appeal.

review of an otherwise unappealable order "[w]hen a district judge . . . [is] of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."

A. Certified Question

"Interlocutory appeals originate from the district court's order itself, not the specific question certified by the district court or the specific question framed by the appellant. An appellate court can and should address a different legal question if it controls the disposition of the certified order." Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co., 428 F.3d 1285, 1291 (10th Cir. 2005) (internal citation omitted); see Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199, 205 (1996) (explaining that "the appellate court may address any issue fairly included within the certified order because it is the order that is appealable" (quotations omitted)). However, "[t]he court of appeals may not reach beyond the certified order to address other orders made in the case." Yamaha Motor Corp., 516 U.S. at 205. Thus, "the correct test for determining if an issue is appropriate for interlocutory review is (1) whether that issue was raised in the certified order; and (2) whether the issue can control the disposition of the order." Paper, Allied-Indus., Chem. & Energy Workers, 428 F.3d at 1291.

This case has a long procedural history, and as the arguments raised on appeal indicate, there are still many open issues. Almost none of these issues, however, are

appropriate for our interlocutory review. To determine which issues are appropriately before us, we must look to the certified order.

This litigation is proceeding piecemeal. When settlement negotiations fell through in 2012 and trial preparation actively began, the parties and the court agreed that there were five threshold legal issues that needed to be decided before the parties could properly prepare for trial. Thus, the litigation continued with the five issues being briefed, argued, and decided in stages.

This appeal arises from the first stage, in which the parties briefed and argued the first issue (which included three sub-issues), and the second issue.[2] However, the district court's order decided only the first issue:

> Have the Pueblos ever possessed aboriginal water rights in connection with their grant or trust lands, and if so, have those aboriginal water rights been modified or extinguished in any way by any actions of Spain, Mexico or the United States?

The district court, adopting the magistrate judge's findings and recommendations, determined that the Pueblos did, at one point, possess aboriginal water rights to the Jemez River in connection with their aboriginal title. No party disputes this determination.

---

[2] The remaining threshold issues, which the parties have not fully briefed or argued to the district court, and which accordingly we do not decide, are (1) if the Pueblos have aboriginal water rights or Winans reserved water rights, what standards apply to quantify such rights; (2) do the Pueblos have Winters reserved rights appurtenant to their trust lands and, if so, how are those rights to be measured; and (3) are the Pueblos entitled to any riparian rights.

After finding that the Pueblos had established aboriginal water rights, the district court then determined that, during the time of Spanish sovereignty, the Spanish crown extinguished those rights, stating:

> Although Spain allowed the Pueblos to continue their use of water, and did not take any affirmative act to decrease the amount of water the Pueblos were using, the circumstances cited by the expert for the United States and Pueblos plainly and unambiguously indicate Spain's intent to extinguish the Pueblos' right to increase their use of public waters without restriction and that Spain exercised complete dominion over the determination of the right to use public waters adverse to the Pueblos' pre-Spanish aboriginal right to use water.

(App'x 287.)

In doing so, the district court deemed the first issue's three sub-issues were mooted by its ruling that Spain had extinguished the Pueblos' water rights.[3] Along the same lines, the second issue asks whether the Winans doctrine is applicable.[4] United States v. Winans, 198 U.S. 371, 381 (1905) (recognizing aboriginal rights reserved to the tribe and not granted in a treaty). Because Winans rights are essentially recognized aboriginal rights, the second issue was resolved by the court's finding that the Pueblos' aboriginal rights had been extinguished by Spain. Thus, because neither the resolutions of the sub-issues nor the resolution of the second

---

[3] The three sub-issues are (1) did the Acts of 1866, 1870 and 1877 have any effect on the Pueblos' water rights and, if so, what effect; (2) did the Pueblo Lands Acts of 1924 and 1933 have any effect on the Pueblos' water rights and, if so, what effect; and (3) did the Indian Claims Commission Act have any effect on the Pueblos' water rights and, if so, what effect.

[4] Issue No. 2: Does the Winans doctrine apply to any of the Pueblos' grant or trust lands?

9

issue could control the disposition of the district court's order, none of these issues is appropriate for interlocutory review.

In finding that Spain extinguished the Pueblos' aboriginal water rights, the district court's certified order explicitly found that "Spain allowed the Pueblos to continue their use of water, and did not take any affirmative act to decrease the amount of water the Pueblos were using." (App'x 287 (emphasis added).). Because our jurisdiction is controlled by the certified order presented to us, see Yamaha Motor Corp., 516 U.S. at 205, we accept this conclusion by the district court for purposes of our analysis.

When certifying this ruling for our review, the district court again noted that "[t]he issue of whether the Pueblos' aboriginal water rights were extinguished by the imposition of Spanish authority without any affirmative act was raised in the Court's Order." (App'x 276 (emphasis added).) Moreover, both of the Appellants' petitions for permission to appeal framed the issue as extinguishment of aboriginal water rights without affirmative action. Although we look to the district court's certified order, and "not the specific question certified by the district court or the specific question framed by the appellant," Paper, Allied-Indus., Chem. & Energy Workers, 428 F.3d at 1291, our task is made easier here because the same question is presented by all of them.

Thus, the controlling question of law in this appeal is whether aboriginal water rights can be extinguished by the imposition of sovereign authority without any affirmative act.

10

B. Issues Not Properly Before This Court

In light of this litigation's long and fragmented history, and the arguments made in this appeal, we find it prudent explicitly to mention a few specific issues that are not before us.

First, the quantification of the Pueblos' water rights is not before us. While this is an important question in the overall litigation, the current quantification of any remaining aboriginal water rights was not raised in the district court's certified order and could in no way control its disposition because the order found that there were no existing aboriginal water rights. Moreover, the proper standard for quantifying any such rights is the subject of the third of the district court's five stated issues, which have not been brought before us by this interlocutory appeal. While this question may be before us one day, today is not that day.

Second, and relatedly, there are many types of water rights; here, we consider only aboriginal rights. The Pueblos may claim other types of water rights in this litigation, but those were not before the court below in this limited proceeding, and they are not before us either.

Third, no actions taken by Mexico or the United States are before us. Although those actions were before the district court, the district court determined that the Pueblos' aboriginal water rights were extinguished by Spain before either Mexico or the United States took sovereignty over the Pueblos' land. Thus, as

11

explained above, any actions taken by Mexico or the United States were mooted by that determination.

None of the above-mentioned issues was raised by the certified order, and thus they are not properly before us for consideration on interlocutory review. In sum, we have jurisdiction to address only the controlling question of law presented by the order below: Whether, as a matter of law, a sovereign can extinguish aboriginal rights to water by the mere imposition of its authority over such water without any affirmative act.

## III. STANDARD OF REVIEW

When faced with a question of law, our review is de novo; when faced with a question of fact, our review is for clear error. Highmark Inc. v. Allcare Health Mgmt. Sys., Inc., 572 U.S. 559, 563 (2014). However, "[o]ur review of mixed questions of law and fact will be 'under the clearly erroneous or de novo standard, depending on whether the mixed question involves primarily a factual inquiry or the consideration of legal principles.'" Roberts v. Printup, 595 F.3d 1181, 1186 (10th Cir. 2010) (quoting Estate of Holl v. Comm'r, 54 F.3d 648, 650 (10th Cir.1995)). "Where a mixed question primarily involves the consideration of legal principles, then a de novo review by the appellate court is appropriate." Osage Nation v. Irby, 597 F.3d 1117, 1122 (10th Cir. 2010).

The question of whether Spain extinguished the Pueblos' aboriginal water rights is ordinarily a mixed question of fact and law, as it requires the application of

12

facts to the legal standard for extinguishment.[5]  Here, however, the district court

determined that Spain extinguished the Pueblos' aboriginal water rights by the

imposition of Spanish law.  Thus, the issue here is the extent and impact of Spanish

law.  A court's determination about foreign law "must be treated as a ruling on a

question of law," rather than as a ruling on a question of fact.  Fed. R. Civ. P. 44.1;

see Grimm v. Comm'r, 894 F.2d 1165, 1166 (10th Cir. 1990) (applying de novo

review to the lower court's interpretation of Philippine law).  As such, the district

court's determination that the imposition of Spanish law extinguished the Pueblos'

aboriginal water rights is reviewed de novo.

## IV.    BACKGROUND

Before turning to the discrete question before us, we provide an overview of

both Spanish sovereignty in the 1500s and aboriginal title.

---

[5] Whether the Pueblos established aboriginal rights is a question of fact. United States v. Santa Fe Pac. R.R. Co., 314 U.S. 339, 345 (1941) ("Occupancy necessary to establish aboriginal possession is a question of fact to be determined as any other question of fact.").  As such, we will only set aside the district court's finding if it is clearly erroneous.  Ornelas v. United States, 517 U.S. 690, 694 n.3 (1996).  Because no party challenges the district court's finding—and because this finding is supported by the record—this finding is not clearly erroneous, and we move forward with our review accepting that the Pueblos possessed aboriginal water rights.

13

A. <u>Spanish Sovereignty and the Pueblos</u>[6]

Spain arrived in the Jemez River Basin in 1598, bringing with it its concept of regalía, the royal prerogative. This was "the political theory of the colonial period . . . that held that the crown exercised supreme power over the administration, licensing, and adjudication of certain spheres of activity and kinds of resources." (App'x 382.) The natural resources that fell within the Spanish crown's regalía "included lands, fields, woodlands, pasturage, rivers, and public waters," which were known as "realengas." (<u>Id.</u>) As to the realengas, the crown could "grant, with whatever limitation it might deem to be convenient, private or communal domain to individuals, towns and villages." (<u>Id.</u> 383.) "It bears noting, too, that while the crown insisted in principle on the right of regalía to intervene judicially to allocate water, it did not always do so, especially when there existed no conflict that required adjudication." (<u>Id.</u>) The crown bestowed its prerogative to local authorities "to oversee the distribution of unused or unoccupied lands and other resources in the New World." (<u>Id.</u>) The direction given to local authorities in the distribution of the realengas "typically called for Indian property and resources to be respected." (<u>Id.</u>)

The Spanish protection of Indian rights can be traced all the way back to the codicil of Queen Isabella's will, drafted in 1504, "in which she admonishes her husband and soon-to-be heirs . . . to make sure that they protect the Indians and their

---

[6] We, like the court below, reviewed both experts' reports and testimony as to the legal principles in place during the time of Spanish sovereignty. Also like the court below, we "assume that the US/Pueblos' expert, Dr. Cutter, is correct and have resolved all factual questions in favor of Dr. Cutter's opinion." (App'x 298.)

14

persons and their possessions." (Id. 609.) Spain also issued a number of informal and formal laws, which were combined to create the Recopilación de Indias, "a compilation of laws issued by the crown and laws viewed broadly; Royal cedulas, letters, instructions, so on and so forth," and applied to the Spanish colonies. (Id. 610.) A number of laws within the Recopilación de Indias address the distribution or combining of lands, and it is repeatedly stated that, in undertaking these actions, Indians should be left their land and any resources that they may need. (Id. 372.) Hence, the Spanish crown was protective of Indian property rights.

When Spain arrived in what is now Mexico, and throughout the years of Spanish sovereignty in the region, "the Spaniards continued to consider Indians as original owners of their property, as well as to recognize their native government." (Id.; id. 380 ("[T]here is no documentary evidence that Spanish magistrates forced Pueblos to allot lands and water within their communities in a particular way.")). In sum, there was "a special, sometimes preferential, status for Indians under Spanish rule." (Id. 388 (quoting William Taylor, Land and Water Rights in the Viceroyalty of New Spain, 50 N.M. Hist. Rev. 189, 191 (1975).)

It was within Spain's regalía, "that is the prerogative of the crown, to ensure effective use of water. That didn't mean that it always exercised its prerogative, but it did have that prerogative." (Id. 617.) There were two main principles guiding Spain's control of water. First, public waters were held in common and shared by everyone. (Id. 631.) Second, "one could not use public waters to the detriment of other users." (Id. 632.) Spain ensured the effective use of water in a number of

15

ways, including a process called a "repartimiento[7] de aguas," similar in concept to the water adjudication underlying this appeal. (Id. 329.) "The repartimiento de aguas might take several forms, and it occurred only when there was more than one user of a source of water." (Id.) Without conflict, a formal repartimiento would not take place; "[s]uch was the situation in the Jemez Valley watershed with respect to the Pueblos of Jemez, Zia, and Santa Ana." (Id.)

When a repartimiento was undertaken, a government official would apply six factors to each party claiming water—(1) prior use, (2) need, (3) purpose of use, (4) legal rights, (5) injury to third parties, and (6) equity and the common good—and then allocate the water accordingly. (Id. 636.) While twenty-two repartimientos were undertaken in central Mexico, there was only one known repartimiento in New Mexico, which took place in Taos in 1823, during the time of Mexican sovereignty. (Id. 617.) "No repartimientos of water were ever made by Spanish or Mexican authorities regarding the Jemez Valley waters used by Jemez, Zia, and Santa Ana. Thus, the governments of Spain and Mexico took no action to intervene in the uses that these Pueblos made of their water supply; nor did Spain or Mexico act to reduce or modify such use." (Id. 395.)

B. Aboriginal Title

Aboriginal title "refers to land claimed by a tribe by virtue of its possession and exercise of sovereignty rather than by virtue of letters of patent or any formal

---

[7] "Repartimiento" translates to "distribution."

16

conveyance." 1 Cohen's Handbook of Federal Indian Law § 15.04 (2019).[8] The concept of aboriginal title, sometimes called "Indian title" or "native title," comes from a recognition that the property rights of indigenous people persist even after another sovereign assumes authority over the land. See Uintah Ute Indians of Utah v. United States, 28 Fed. Cl. 768, 784 (1993). Aboriginal title was recognized by all European sovereigns and the United States, and "is considered as sacred as the fee simple of the whites." Mitchel v. United States, 34 U.S. 711, 746 (1835); see Johnson & Graham's Lessee v. M'Intosh, 21 U.S. 543, 574 (1823).

Whether a tribe had aboriginal title is a question of fact; a tribe must prove that it had "actual, exclusive and continuous use and occupancy for a long time." Uintah Ute Indians of Utah, 28 Fed. Cl. at 784. Once established, however, aboriginal title remains until it is extinguished, and "[a]s against any but the sovereign, original Indian title was accorded the protection of complete ownership." United States v. Alcea Band of Tillamooks, 329 U.S. 40, 46 (1946).

The district court found that the Pueblos had established aboriginal rights. No party challenges that finding on appeal, so we focus our analysis on whether those rights were extinguished. See supra n.6.

Extinguishing aboriginal rights is complicated; aboriginal rights can only be extinguished by the sovereign. See Oneida Indian Nation v. Cty. of Oneida ("Oneida

---

[8] The Supreme Court frequently cites to Mr. Cohen's work and has referred to him as "an acknowledged expert in Indian law." Squire v. Capoeman, 351 U.S. 1, 8–9 (1956).

17

I"), 414 U.S. 661, 667 (1974).  A sovereign can extinguish aboriginal title "by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise."  Santa Fe Pac. R.R. Co., 314 U.S. at 347.  No matter the method used, the sovereign's intent to extinguish must be clear and unambiguous; "an extinguishment cannot be lightly implied in view of the avowed solicitude of the Federal Government for the welfare of its Indian wards."  Id. at 354.

Moreover, "if there is doubt whether aboriginal title has been validly extinguished by the United States, any 'doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of' the Indians." Pueblo of Jemez v. United States, 790 F.3d 1143, 1162 (quoting Santa Fe Pac. R.R. Co., 314 U.S. at 354).  "[T]he actual act (or acts) of extinguishment must be plain and unambiguous.  In the absence of a clear and plain indication in the public records that the sovereign intended to extinguish all of the rights in their property, Indian title continues."  Lipan Apache Tribe v. United States, 180 Ct. Cl. 487, 492 (1967) (quotations and alteration omitted) (quoting Santa Fe Pac. R.R. Co., 314 U.S. at 353).

The leading case on extinguishment is United States v. Santa Fe Pacific Railroad Co., 314 U.S. 339 (1941).  There, the United States (as guardians for the Walapai Tribe) brought suit to enjoin the Railroad from interfering with the Walapais' aboriginal title.  The Railroad asserted that it had full title to the land, unencumbered by the Walapais' aboriginal title, pursuant to a land grant in an 1866 congressional act which stated that the "United States shall extinguish, as rapidly as may be consistent with public policy and the welfare of the Indians, and only by their

18

voluntary cession, the Indian title to all lands falling under the operation of this act."

Id. at 344. After determining that the grant to the Railroad did not itself extinguish

the Walapais' title, the court addressed whether the Walapais' title had been

extinguished prior to the 1866 grant. Before doing so, the court reiterated the United

States' exclusive right to extinguish aboriginal title, "whether it be done by treaty, by

the sword, by purchase, by the exercise of complete dominion adverse to the right of

occupancy, or otherwise." Id. at 347.

The court looked to a number of congressional acts to determine if those acts

extinguished the Walapais' title. The court first looked to the Act of February 27,

1851, which extended the Indian Trade and Intercourse Act of June 30, 1834, to

cover the tribes in Arizona and New Mexico. Id. Because the 1851 Act "plainly

indicate[d] that in 1851 Congress desired to continue in these territories the

unquestioned general policy of the Federal government to recognize such right of

occupancy," the court determined that it did not extinguish the Walapais' title. Id. at

348. The court also looked to the two acts from 1854 and 1870, which established

the Surveyor General of New Mexico and directed him "to ascertain the origin,

nature, character, and extent of all claims to lands under the laws, usages, and

customs of Spain and Mexico[,] and to make a report on all such claims as originated

before the cession of the territory to the United States." Id. at 349. Because only

Congress has the authority to extinguish title, however, the court determined that the

only extinguishment could have come from congressional action taken based on the

19

Surveyor General's report.  Id. at 350.  Because the court was "not advised that Congress took any such action," the Walapais' title was not extinguished.  Id. at 351.

The court also looked to see if the creation of reservations or forcible removal extinguished the Walapais' title.  In 1865, Congress established the Colorado River reservation, and suggested that various tribes, the Walapais included, should settle there.  Id. at 351–52.  After the Walapais refused this offer, they were forcibly removed (without congressional mandate) to the reservation in 1874.  Id. at 354.  They left it the following year and returned to their old country.  Id. at 355.  The court concluded that "[n]o forfeiture can be predicated on an unauthorized attempt to effect a forcible settlement on the reservation unless we are to be insensitive to the high standards for fair dealing in light of which laws dealing with Indian rights have long been read."  Id. at 355–56.

It was not until 1881, when the tribe requested that the government create a reservation for them, that any of the Walapais' aboriginal rights were extinguished.  A reservation was created, and "[t]here was an indication that the Indians were satisfied with the proposed reservation. A few of them thereafter lived on the reservation; many of them did not. While suggestions recurred for the creation of a new and different reservation, this one was not abandoned."  Id. at 357 (footnotes omitted).  The court therefore concluded that the reservation's "creation at the request of the Walapais and its acceptance by them amounted to a relinquishment of any tribal claims to lands which they might have had outside that reservation."  Id. at 357–58 (footnoted omitted).

20

Santa Fe Pacific established that a sovereign can extinguish aboriginal title "by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise." 314 U.S. at 347. However, in so establishing, the court placed great emphasis on "the policy of the federal government from the beginning to respect the Indian right of occupancy, which could only be interfered with or determined by the United States." Id. at 345 (quoting Cramer v. United States, 261 U.S. 219, 227 (1923)). The court admonished, "it would take plain and unambiguous action to deprive the Walapais of the benefits of that policy." Id. at 346. For "an extinguishment cannot be lightly implied in view of the avowed solicitude of the Federal Government for the welfare of its Indian wards." Id.

## V.    DISCUSSION

The controlling question of law in this appeal is whether, as a matter of law, a sovereign can extinguish aboriginal rights by the mere imposition of its authority and without any affirmative adverse act. We hold that it cannot.

A. Extinguishing Aboriginal Rights Requires an Affirmative Act

Courts have addressed the extinguishment of aboriginal rights numerous times. They have addressed extinguishment by treaty, see, e.g., Oregon Dep't of Fish & Wildlife v. Klamath Indian Tribe, 473 U.S. 753, 770 (1985) (analyzing an 1864 treaty ceding land to the United States to determine whether hunting and fishing rights were retained); extinguishment by purchase, see, e.g., Mitchel v. United States, 34 U.S. 711 (1835) (holding that a tribe's aboriginal rights were extinguished when Spain

21

ratified the sale of tribal land by the tribe); and extinguishment by congressional act, see, e.g., Alaska v. Native Vill. of Venetie Tribal Gov't, 522 U.S. 520, 524 (1998) (explaining that the Alaska Native Claims Settlement Act "completely extinguished all aboriginal claims to Alaska land"); see also United States v. Gemmill, 535 F.2d 1145, 1148–49 (9th Cir. 1976) (holding that "a series of federal actions subsequent to 1851"—which "has included expulsion by force, inconsistent use, and voluntary payment of [a] compensation agreement"—"clearly demonstrates that the Pit River Indian title has been extinguished"); Plamondon ex rel. Cowlitz Tribe of Indians v. United States, 467 F.2d 935, 937 (Ct. Cl. 1972) ("We need not decide whether taken singly, the change in congressional intent, the establishment of [a reservation which included the Cowlitz], or the Presidential proclamation of March 20, 1863, would be sufficient to extinguish Cowlitz title. We agree with the Commission that all three together are clearly sufficient.").

In all cases addressing extinguishment courts have pointed to specific sovereign action that was directed to a right held by an Indian tribe. They have then looked at the actual adverse impact of that directed action on the tribal right at issue. Only when that review has shown a sovereign intent to extinguish an Indian right, have courts found that an extinguishment was effectuated. An intent to extinguish can only be found when there is an affirmative sovereign action focused at a specific right that is held by an Indian tribe that was intended to, and did in fact, have a sufficiently adverse impact on the right at issue. Plamondon ex rel. Cowlitz Tribe of Indians, 467 F.2d at 938 (the court looked at the fact that Congress opened the

22

Cowlitz land for white settlement, but it concluded that the small number of settlers—the actual adverse impact—was insufficient to extinguish). Thus, a sovereign cannot extinguish aboriginal rights without affirmatively acting in a manner adverse to the specific aboriginal rights at issue.

Santa Fe Pacific requires a sovereign to exercise complete dominion, not merely to possess complete dominion. 314 U.S. at 347. As the Supreme Court recognized, all conquering sovereigns possess complete dominion. See M'Intosh at 34 U.S. 574. However, to exercise something is not to merely possess it, but "to put [it] into action." Exercise, Black's Law Dictionary (11th ed. 2019). Thus, to "exercise" complete dominion, the sovereign must put its dominion into action, through some sort of affirmative act.

Courts repeatedly refer to "acts" or "action" when discussing extinguishment. See Alcea Band of Tillamooks, 329 U.S. at 46 ("As against any but the sovereign, original Indian title was accorded the protection of complete ownership; but it was vulnerable to affirmative action by the sovereign, which possessed exclusive power to extinguish the right of occupancy at will. Termination of the right by sovereign action was complete and left the land free and clear of Indian claims." (emphasis added)); Oneida Cty. v. Oneida Indian Nation of N.Y. State ("Oneida II"), 470 U.S. 226, 245 (1985) (noting that the Nonintercourse Act of 1793 "merely codified the principle that a sovereign act was required to extinguish aboriginal title"); Oneida I, 414 U.S. at 667 ("That right, sometimes called Indian title and good against all but the sovereign, could be terminated only by sovereign act." (emphasis added)); Pueblo

23

of Jemez, 790 F.3d at 1158 ("[T]he grant does not impair aboriginal title, which the grantee must respect until aboriginal title has been extinguished by treaty, agreement, or other authorized actions of the Indians or Congress." (emphasis added)); Gemmill, 535 F.2d at 1147 ("[W]hen the Government clearly intends to extinguish Indian title the courts will not inquire into the means or propriety of the action . . . ." (emphasis added)); id. at 1148 ("The relevant question is whether the governmental action was intended to be a revocation of Indian occupancy rights . . . ." (emphasis added)). Indeed, we could find no case that determined that aboriginal rights were extinguished without pointing to a specific governmental act that terminated those rights, be it a treaty, a statute, a congressional appropriation of funds, or a presidential proclamation.

The need for an affirmative act is further underscored by the analysis dictated by precedent, which requires courts to find a "clear and plain indication" that the sovereign intended to extinguish aboriginal title. See Santa Fe Pac. R.R. Co., 314 U.S. at 353; see also United States v. Dion, 476 U.S. 734, 738–39 (1986) ("[A] clear and plain intent must be demonstrated."). Courts have determined that there was no sovereign intent to extinguish aboriginal title adequately demonstrated even by the following actions: when Congress specifically created a reservation for a particular tribe, id. at 353–54; when Congress granted tribal land to a railroad, Buttz v. N. Pac. R.R., 119 U.S. 55, 66 (1886); or when a treaty ceding tribal land did not explicitly mention rights to hunt and fish, Mille Lacs Band of Chippewa Indians v. Minnesota, 124 F.3d 904, 926 (8th Cir. 1997), aff'd sub nom. Minnesota v. Mille Lacs Band of

24

<u>Chippewa Indians</u>, 526 U.S. 172 (1999). In those cases, the sovereign took affirmative action specifically referencing the Indian tribes in question and, still, the sovereign's intent to extinguish was not "clear and plain." Without an affirmative adverse act, there is neither directed sovereign action nor consequences from that action from which a court may find a clear and plain indication that the sovereign intended to extinguish aboriginal title.

Determining adversity requires an inquiry into the governmental action and its impact on the specific tribe. For example, in <u>Cowlitz</u>, the court explained that the government had opened the Cowlitz land for white settlement, but it declined to find that such action constituted extinguishment because the small number of settlements that actually occurred "did not significantly disrupt the Cowlitz way of life." <u>Plamondon ex rel. Cowlitz Tribe of Indians</u>, 467 F.2d at 938. Thus, adversity was determined not by the general fact that the land could be settled, but by looking at what actually happened.

For the foregoing reasons, we conclude that a sovereign must affirmatively take an action to exercise complete dominion in a manner adverse to the Indians' right of occupancy sufficient to extinguish aboriginal title. <u>See</u> <u>Santa Fe Pac. R.R. Co.</u>, 314 U.S. at 347.

B. <u>Spain's General Administration of Its Water Administration System Was Not Adverse to the Pueblos' Aboriginal Rights.</u>

There is no indication, let alone a clear and plain indication, that Spain intended to extinguish any aboriginal rights of these three Pueblos. Spain's general

25

assertion of governing authority does not indicate any intent to extinguish the Pueblos' water rights because, in general, Spain respected the Indians and their possessions. See Felix S. Cohen, Spanish Origin of Indian Rights in the Law of the United States, 31 Geo. L.J. 1, 9 (1942) ("[T]he humane principles which guide our own law in Indian affairs all faithfully follow . . . the edicts of Spanish kings.").

Even if we narrow our focus to Spain's system for administering water, this system was guided by general principles, none of which specifically mention any Indian tribes, let alone the Pueblos of Jemez, Santa Ana, and Zia. Although Spain possessed the right to conduct repartimientos to allocate water, it never exercised that right as to the Pueblos here. There is no showing that Spain clearly intended to extinguish the rights of these specific Pueblos, when nothing presented by the parties indicates that Spain had any issues with the Pueblos' water use. The passive implementation of a generally applicable water administration system does not establish Spain's clear intent to extinguish the aboriginal water rights of these three Pueblos.

Nor is there any evidence in the experts' reports or testimony that Spain's water administration system was adverse to the Pueblos, as it never actually ended the Pueblos' exclusive use of water or limited their use in any way. A repartimiento was never undertaken on the Jemez River, and there is no evidence that the Pueblos ever decreased their water usage or were unable to increase their usage. Indeed, there is no evidence that Spanish sovereignty had any impact on the Pueblos' use of the water from the Jemez River at all. Because Spain's water administration system had

26

no impact, let alone a negative impact, on the Pueblos' right to use water, it cannot be said that the system was "adverse" to the Pueblos.

## VI.    CONCLUSION

All conquering sovereigns possess authority over their land and resources. However, not until the sovereign exercises this authority through clear and adverse affirmative action may it extinguish aboriginal rights.  We therefore REVERSE the district court's order and REMAND the case to the district court for further proceedings consistent with this opinion.

18-2164, 18-2167, *United States v. Abouselman*
**TYMKOVICH**, C.J., dissenting.

It is apparent to me that the resolution of this appeal is not likely to materially advance the ultimate termination of this 37-year-old case, *see* 28 U.S.C § 1292(b), and that this interlocutory appeal therefore should not have been granted.  The question of whether aboriginal water rights have been extinguished is an undeniably important aspect of this case.  But deciding that issue in a vacuum without also considering related issues of quantification and the settled expectations of the many interested parties in this case, is not the best way to achieve a just result.  For these reasons, I respectfully dissent.

Appeals pursuant to §1292(b) should be sparingly granted.  As we have observed, "the enlargement of the right to appeal should be limited to extraordinary cases in which extended and expensive proceedings probably can be avoided by immediate final decisions of controlling questions encountered early in the action." *Utah State Dep't of Health v. Kennecott Corp.*, 14 F.3d 1489, 1495 (10th Cir. 1994) (quoting Tenth Circuit committee report reprinted at 1958 U.S.C.C.A.N. 5255, 5262).  This is not such a case.  This appeal will not avoid extended and extensive proceedings and it does not come early in the case, but some 35 years after it was filed.  Indeed, as Judge Ebel states in his opinion, this litigation has a "long and fragmented history," Maj. Op. at 11, which has not been improved by the granting of this piecemeal appeal.

More to the point, this appeal addresses only two of five threshold issues that were identified as necessary to resolve *before* the parties could even put together a discovery

plan.[1] If an interlocutory appeal is permitted after the district court rules on each of the remaining threshold issues, it will take the better part of a decade to even arrive at a point where the parties can craft a plan for discovery. Going forward, this case will be much better served by avoiding piecemeal appeals—particularly given how intertwined the issues are, as further discussed below.

On the merits, the majority determines the Pueblos' aboriginal water rights have not been extinguished. But this cannot mean as a practical matter that the Pueblos now have limitlessly expanding water rights. The Pueblos, while disclaiming an intention to seek an *expanding* water right, nonetheless assert that "their aboriginal water rights include *an amount sufficient to satisfy their future needs*." Pueblos' Reply Br. at 18 (emphasis added). This seems a matter of semantics, but in any case it is problematic to

---

[1] The questions were as follows:
(1) Have the Pueblos ever possessed aboriginal water rights in connection with their grant or trust lands, and if so, have those aboriginal water rights been modified or extinguished in any way by any actions of Spain, Mexico, or the United States?
> *Sub-issue*: Did the Acts of 1866, 1870, and 1877 have any effect on the Pueblos' water rights and, if so, what effect?
> *Sub-issue*: Did the Pueblo Lands Acts of 1924 and 1933 have any effect on the Pueblos' water rights and, if so, what effect?
> *Sub-issue*: Did the Indian Claims Commission Act have any effect on the Pueblos' water rights and, if so, what effect?
(2) Does the *Winans* doctrine apply to any of the Pueblos' grant or trust lands?
(3) If the Pueblos have aboriginal water rights or *Winans* reserved water rights, what standards apply to quantify such rights?
(4) Do the Pueblos have *Winters* reserved rights appurtenant to their trust lands and, if so, how are those rights to be measured?
(5) Are the Pueblos entitled to any riparian rights?
App. at 304.

2

decide whether the Pueblos have aboriginal water rights entitling them to an as-yet-undefined right to expanding or future uses, without also considering the implications for the many other water users on the Jemez, some of whose water rights date to Spanish colonial rule (to say nothing of water users on the Rio Grande, on which other Pueblos may claim a similar aboriginal right to expanding or future uses).

To be sure, the Pueblos disclaim any intention of seeking a limitless water right. But even if their purported future water needs were limited to practicable irrigable acreage, *see Arizona v. California*, 373 U.S. 546, 600–01 (1963), it is difficult to see how their claimed entitlement to a quantity of water to satisfy their future homeland needs would leave water for any other water rights holders on the Jemez.[2]  The majority's conclusion here may have serious implications for all other users of the Jemez River and, by implication, other river systems in the Southwest—unless the district court takes into account at least several important considerations.

First, on remand the district court may wish to consider whether, although the imposition of Spanish law did not extinguish the Pueblos' aboriginal water rights, it nonetheless placed certain limits on those rights by virtue of the arrival of non-Pueblo water users on the Jemez River.  The competing experts in this case agreed that once non-

---

T      [2] The Pueblos' claim to expanding or future needs seems inconsistent with the doctrine of aboriginal rights.  Even assuming for purposes of argument that the doctrine applies as fully to water as it does to land, it requires the Pueblos to show actual, exclusive and continuous use and occupancy for a long period of time.  *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1165 (10th Cir. 2015); *United States v. Pueblo of San Ildefonso*, 513 F.2d 1383, 1394 (Ct. Cl. 1975).

3

Pueblo water users were allowed on the Jemez River, it was considered by the Spanish crown to be a shared public resource. On behalf of the government and the Pueblos, Dr. Cutter testified that under Spanish and Mexican law, surface interests of land were treated as separate from interests in common public water sources. Professor Hall, testifying on behalf of New Mexico and the non-Pueblo water users, agreed. Treating fee title to land separately from the right to water is consistent with the doctrine of prior appropriation, which focuses not on land ownership but on the application of water to beneficial uses. *See, e.g., Colorado v. New Mexico*, 459 U.S. at 179 n.4 (water rights "do not depend on land ownership and are acquired and maintained by actual use"). Even the Treaty of Guadalupe Hidalgo recognized that the Pueblos' right to water was limited to that which was actually used.[3] *See New Mexico ex rel. Martinez v. City of Las Vegas*, 89 P.3d 47, 60 (N.M. 2004) (rejecting the argument that the Treaty of Guadalupe-Hidalgo provided an expanding Pueblo water right).

Second, *Arizona v. California* is instructive. In that case, the Supreme Court held five tribes were entitled to a priority date back to the establishment of their respective reservations. But the water right was based on the size of each reservation and productive agricultural acreage—"practicable irrigable acreage"—to the extent that was "feasible and fair." 373 U.S. at 601. Likewise in this case, the appurtenant water right to Jemez

---

[3] It might be helpful to analogize to real property. The Pueblos have no entitlement to expanded reservation lands. Likewise, they are not entitled to expanded water rights not tethered to historical practices.

4

River water should be the "feasible and fair" amount based on traditional native irrigation practices.

Third, the use of water is undeniably different from the use of land, and therefore the district court should be wary of applying precedent involving aboriginal land rights to the question of water rights. The Supreme Court decision that first recognized the doctrine of aboriginal rights, *Johnson v. M'Intosh*, 21 U.S. (8 Wheat.) 543 (1823), spoke only of "the rightful occupants of *the soil*, with a legal as well as just claim to retain possession of it, and to use it according to their own discretion." *Id.* at 573–74 (emphasis added). More recent Supreme Court cases describing aboriginal rights continue to emphasize the applicability of the doctrine to land:

> It very early became accepted doctrine in this Court that although *fee title to the lands* occupied by Indians when the colonists arrived became vested in the sovereign—first the discovering European nation and later the original States and the United States—a right of occupancy in the Indian tribes was nevertheless recognized. That right, sometimes called Indian title and good against all but the sovereign, could be terminated only by sovereign act. Once the United States was organized and the Constitution adopted, *these tribal rights to Indian lands* became the exclusive province of the federal law.

*Oneida Indian Nation of N.Y. v. Oneida County*, 414 U.S. 661, 667 (1974) (emphases added). One might respond, as the Pueblos did in their reply brief, that water rights are implied and part of the "bundle of sticks" comprising a tribe's land rights. But such implied rights are anathema to the doctrine of prior appropriation, in which water rights "do not depend on land ownership and are acquired and maintained by actual use."

5

*Colorado v. New Mexico*, 459 U.S. 176, 189 n.4 (1982). And as further discussed below, the Pueblos' assertion of "implied water rights" is inconsistent with how water was treated under Spanish and Mexican rule.

The difference between aboriginal rights to water and aboriginal rights to land is highlighted by this Circuit's decision in *Pueblo of Jemez v. United States*, 790 F.3d 1143 (10th Cir. 2015). In that case, the Jemez Pueblo asserted aboriginal rights to what is now the Valles Caldera National Preserve. The panel addressed the narrow question of whether the Jemez Pueblo's aboriginal rights to that land had been extinguished by a land grant in 1860 to non-Puebloans. In holding that the land grant did not extinguish the Pueblo's aboriginal land claim, the panel recognized that "simultaneous *occupancy and use of land* pursuant to fee title and aboriginal title could occur because the nature of Indian occupancy differed significantly from the occupancy of settlers." *Id.* at 1165 (emphasis added). That reasoning, however correct it may be with respect to land use, has limited application to water use—particularly where, as here, the Jemez River is fully appropriated. Unlike land, the use of water by one user, regardless of its purpose, is necessarily to the exclusion of all others.[4]

---

[4] The different characteristics of water are well-recognized. Water is a "usufruct," that is, a substance that is not impaired by use. *See Usufruct*, Black's Law Dictionary (11th ed. 2019). For our purposes, after it is applied to a use, it returns back to the river system or evaporates and later returns somewhere as precipitation. And to be used beneficially for the greatest good, water must be diverted from streams or rivers and transported to fertile lands. No water regime ever gave one user unfettered access to all of the water in a river merely because it flowed across land owned in fee simple.

6

Fourth, the reality is we have no "law of ancestral Indian water rights." *See generally* Felix S. Cohen, *Cohen's Handbook of Federal Indian Law*, § 4.07[2][c] (2012). Instead, it is more a question of federal common law. *See id.* § 4.07[2][c], at 323; *Oneida Indian Nation*, 414 U.S. at 667. And as I've tried to explain, that common law is a problem of *quantification*, not *existence*. Legislation like the Pueblo Compensation Act of 1933 recognized the problem by specifying that any compensation to Pueblos for the fair market value of their last water rights shall not "be construed to deprive any of the Pueblo Indians of a prior right to use of water from streams running through or bordering on their respective pueblos for domestic, stock-water, and irrigation purposes . . . ." Pueblo Compensation Act, 48 Stat. 108, 111 (1933). In other words, Indian water rights devolved from an unlimited right to the stream prior to other appropriators, to a "reasonable" (or "feasible and fair") amount when other users lawfully accessed the stream.

Fifth, in addressing the complicated issue of quantification on remand, the district court should keep firmly in mind the Supreme Court's observations in *City of Sherill, N.Y. v. Oneida Indian Nation of N.Y.*, 544 U.S. 197 (2005). In that case, the Oneida Indian Nation resisted the payment of property taxes to the City of Sherill on the basis that the Oneidas recently had acquired fee title to parcels in Sherill that were once part of the Oneida reservation. The Oneidas argued that their reacquisition of these parcels revived their ancient sovereignty, and that therefore Sherill had no regulatory or taxing

7

authority over the parcels. In holding that the Oneida Indian Nation could not unilaterally revive its ancient sovereignty, the Supreme Court emphasized that "longstanding observances and settled expectations are prime considerations." *Id.* at 218.

In addressing the difficult issue of quantification in this case, "longstanding observances and settled expectations" should be carefully considered on remand. Some of the non-Pueblo water users have held water rights on the Jemez River as far back as the late 1700s. While such rights are undeniably junior to the rights of the Pueblos, a quantification by the district court that grants potentially limitless expanding water rights for the Pueblos would upset the settled expectations of the non-Pueblo water users that had developed over the nearly two centuries before the Pueblos finally initiated this litigation in 1983. Such settled expectations and the passage of so much time may mean that the Pueblos' aboriginal water rights, while not extinguished, have necessarily been modified in such a way as to preclude the Pueblos' expanding or future use claims.