**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT
_____

**March 22, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

PUEBLO OF JEMEZ, a federally
recognized Indian Tribe,

    Plaintiff - Appellant,

v.

UNITED STATES OF AMERICA,

    Defendant - Appellee,

and

NEW MEXICO GAS COMPANY,

    Intervenor Defendant- Appellee.

------------------------------

ROBERT A WILLIAMS, JR.; REBECCA
TSOSIE; MATTHEW L.M. FLETCHER;
KRISTEN A. CARPENTER; JOHN
BORROWS; NELL JESSUP NEWTON;
SETH DAVIS; HEATHER D.
WHITEMAN RUNS HIM; AMERICANS
FOR INDIAN OPPORTUNITY;
ASSOCIATION ON AMERICAN
INDIAN AFFAIRS; INDIAN LAND
TENURE FOUNDATION; INDIAN LAW
RESOURCE CENTER; INDIAN LAND
WORKING GROUP; KEWA PUEBLO,
f/k/a Santo Domingo Pueblo; OHKAY
OWINGEH; PICURIS PUEBLO;
PUEBLO OF ACOMA; PUEBLO OF
COCHITI; PUEBLO DE SAN
ILDEFONSO; PUEBLO OF ISLETA;

No. 20-2145

PUEBLO OF POJOAQUE; PUEBLO OF
SANDIA; PUEBLO OF SAN FELIPE;
PUEBLO OF SANTA ANA; PUEBLO OF
TESUQUE; TAOS PUEBLO; YSLETA
DEL SUR PUEBLO; ZUNI TRIBE OF
THE ZUNI INDIAN RESERVATION;
ROBERT ALAN HERSHEY; PUEBLO
OF LAGUNA,

      Amici Curiae.

_____

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:12-CV-00800-JB-JFR)**

_____

Christina S. West of Barnhouse Keegan Solimon & West LLP, Los Ranchos de
Albuquerque, New Mexico (Randolph H. Barnhouse and Tierra N. Marks of Barnhouse
Keegan Solimon & West LLP, Los Ranchos de Albuquerque, New Mexico; Thomas E.
Luebben of Law Offices of Thomas E. Luebben, Santa Fe, New Mexico, with her on the
brief), for Plaintiff-Appellant.

Mary Gabrielle Sprague, Attorney, Environment and Natural Resources Division, U.S.
Department of Justice (Todd Kim, Assistant Attorney General, with her on the brief),
Washington, D.C., for Defendant-Appellee.

Kirk R. Allen and Elizabeth M. Reitzel, Miller Stratvert, P.A., Albuquerque, New
Mexico, for Intervenor Defendant-Appellee.

Zackeree S. Kelin of Davis Kelin Law Firm, LLC, Albuquerque, New Mexico, filed an
amicus curiae brief on behalf of Plaintiff-Appellant, for Kewa Pueblo (f.k.a. Santo
Domingo Pueblo), Ohkay Owingeh, Picuris Pueblo, Pueblo of Acoma, Pueblo of Cochiti,
Pueblo de San Ildefonso, Pueblo of Isleta, Pueblo of Pojoaque, Pueblo of Sandia, Pueblo
of San Felipe, Pueblo of Santa Ana, Pueblo of Tesuque, Taos Pueblo, Ysleta Del Sur
Pueblo, The Zuni Tribe of the Zuni Indian Reservation, joined by The Pueblo of Laguna,
James M. Burson, General Counsel and Government Affairs Director, Pueblo of Laguna,
Laguna, New Mexico, for the Pueblo of Laguna.

Gregory P. Barbee of Sheppard Mullin Richter & Hampton, LLP, Los Angeles,
California, filed an amicus curiae brief on behalf of Plaintiff-Appellant, for Americans
for Indian Opportunity, Association of American Indian Affairs, Indian Land Tenure
Foundation, Indian Law Resource Center, and Indian Law Working Group.

Robert Alan Hershey, Clinical Professor of Law Emeritus, James E. Rogers College of Law, Tucson, Arizona, filed an amicus curiae brief on behalf of Plaintiff-Appellant, for 9 Professors of Indian Law.

_____

Before **PHILLIPS**, **MORITZ**, and **EID**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

This case returns to us after remand and trial. It arises from the Pueblo of Jemez's ("the Jemez Pueblo") action against the United States under the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a. At trial, the Jemez Pueblo claimed aboriginal title to the entire lands now comprising the Valles Caldera National Preserve ("Valles Caldera"), which the United States purchased from private landowners in 2000.

In an earlier appeal, we reviewed the district court's ruling dismissing the case for lack of subject-matter jurisdiction. We reversed and remanded. *Pueblo of Jemez v. United States* (*Jemez I*), 790 F.3d 1143, 1170–73 (10th Cir. 2015). We ruled that an 1860 federal grant of title to private landowners would not extinguish the Jemez Pueblo's claimed aboriginal title. And we remanded for the Jemez Pueblo to establish that it once and still had aboriginal title to the lands at issue.

After a twenty-one-day trial, the district court ruled that the Jemez Pueblo failed to establish ever having aboriginal title to the entire lands of the Valles Caldera. It concluded that the Jemez Pueblo had failed to show that it ever used the entire claimed land to the exclusion of other Indian groups.

3

The Jemez Pueblo moved for reconsideration under Federal Rule of Civil Procedure 59(e). But rather than seek reconsideration of its complaint's QTA claim to the entire Valles Caldera, the Jemez Pueblo shrunk its QTA claim into claims of title to four discrete subareas within the Valles Caldera: (1) Banco Bonito, (2) the Paramount Shrine Lands, (3) Valle San Antonio, and (4) the Redondo Meadows. The district court declined to reconsider all but Banco Bonito, on grounds that the Jemez Pueblo hadn't earlier provided the government notice of these claims. Even so, being thorough, the court later considered and rejected those three claims on the merits.

As for Banco Bonito, the district court concluded that the Jemez Pueblo had given the government notice of this claim by asserting it in its earlier partial-summary-judgment motion. On reconsideration, the district court approached the Jemez Pueblo's claim to aboriginal title over Banco Bonito in two steps. First, it found that the Jemez Pueblo had established aboriginal title to Banco Bonito between the early 1400s and 1650. Second, operating on its understanding of *Jemez I*, the court found that the Jemez Pueblo had lost that title sometime after 1650 by not continuously maintaining its use to the exclusion of other Indian groups.

Of the issues raised by the Jemez Pueblo on appeal, we primarily address its challenge to the district court's ruling that the Jemez Pueblo lost aboriginal title to Banco Bonito. We conclude that the district court erroneously interpreted *Jemez I* in ruling that the Jemez Pueblo lost its established aboriginal title to Banco Bonito. Contrary to the district court's reading, *Jemez I* does not set a condition that the

4

Jemez Pueblo use the land to the exclusion of other Indian groups after aboriginal title is established.

In our circuit, both before and after *Jemez I*, the Jemez Pueblo could lose its established aboriginal title to Banco Bonito only if its title had been extinguished or abandoned. And the district court concluded that neither of those conditions had occurred. So in accordance with longstanding Supreme Court precedent, and by the district court's findings, the Jemez Pueblo still has aboriginal title to Banco Bonito.

Thus, exercising jurisdiction under 28 U.S.C. § 1291, we reverse in part the denial of the Jemez Pueblo's motion for reconsideration, and we vacate in part and remand with instructions to the district court to enter judgment consistent with this opinion. We affirm in all other respects.

## BACKGROUND

### I.    Factual Background[1]

This case presents a dispute over title to the lands within the Valles Caldera—a supervolcano crater spanning twelve miles across the Jemez Mountains of New Mexico. For over 800 years, many American Indian tribes and pueblos have used the Valles Caldera for hunting, gathering, and various cultural and religious practices. Redondo Peak, the highest mountain in the Valles Caldera, is a site long used by

---

[1] These undisputed facts come from the district court's thorough Sealed Memorandum Opinion, Findings of Fact, Conclusions of Law, and Order and Sealed Memorandum Opinion and Order resolving the Jemez Pueblo's Motion to Reconsider.

multiple Indian groups for religious pilgrimages. It is home to several shrines, including the Jemez Pueblo Shrine.[2]

The ancestral Jemez first occupied agricultural sites within the Valles Caldera in the late 1200s and early 1300s CE.[3] Between 1300 and 1700 CE, the Jemez Pueblo built thirty-five villages and thousands of fieldhouses in an area of the Valles Caldera known as the northern Rio Jemez watershed. Most relevant here, the Jemez Pueblo occupied 100 fieldhouses on Banco Bonito, located in the southwestern corner of the Valles Caldera, throughout a 400-year period, but mainly between 1500 and 1650 CE. The Jemez Pueblo built and exclusively occupied the fieldhouses in Banco Bonito—the only Indian tribe ever to do so.

By 1650, the Jemez Pueblo's farming of Banco Bonito had largely ceased. But in the 350-plus years since then, the Jemez Pueblo has continuously used Banco Bonito in accessing Redondo Peak and other parts of the Valles Caldera. In doing so, the Jemez Pueblo traverses a trail network through Banco Bonito, to Redondo Peak, and to other surrounding areas in the southwestern corner of the Valles Caldera.

In 1860, Congress authorized Luis Maria de Baca's heirs ("Baca heirs") to select up to five square tracts of vacant land totaling nearly 500,000 acres anywhere within the New Mexico Territory. *See* Act of June 21, 1860, Pub. L. No. 36–197, 12 Stat. 71 ("1860 Act"). The 1860 Act settled a Mexican land-grant dispute with the town of Las Vegas,

---

[2] The Jemez Pueblo calls this shrine the Paramount Shrine.

[3] "CE stands for of the common era" and "is an alternative way of expressing the concept denoted by AD." *Jemez I*, 790 F.3d at 1148 n.5.

New Mexico. The Baca heirs' first-selected parcel included 99,289 acres in and near the

Valles Caldera ("Baca Location No. 1"). Baca Location No. 1 has had many corporate

and individual owners over the proceeding decades.

In 2000, Congress passed the Valles Caldera Preservation Act ("Preservation

Act"). *Jemez I*, 790 F.3d at 1149–50. The Preservation Act authorized the purchase of the

property interests of the Baca heirs' successors-in-interest in 94,761 acres in Baca

Location No. 1.[4] This purchase led to the establishment of the Valles Caldera National

Preserve.

## II.     Procedural History

In 2012, the Jemez Pueblo sued the United States under the QTA, 28 U.S.C.

§ 2409a, to quiet title to the Jemez Pueblo's interest in all of the lands within the Valles

Caldera National Preserve. Along with quieting title, the Jemez Pueblo sought a judgment

---

[4] The Preservation Act was repealed and replaced by the National Defense Authorization Act of 2015, Pub. L. No. 113–291, § 3043, 128 Stat. 3292, 3792 ("National Defense Act"). The National Defense Act provides that the Secretary of the Interior, "in consultation with Indian tribes and pueblos, shall ensure the protection of traditional cultural and religious sites in the [Valles Caldera] Preserve." *Id.* § 3043(b)(11)(A), 128 Stat. at 3795. It also provides that the Secretary "shall provide access" to such sites by "members of Indian tribes or pueblos" and "may, on request of an Indian tribe or pueblo, temporarily close to [the] general public . . . specific areas of the Preserve to protect traditional cultural and customary uses" of those areas. *Id.* § 3043(b)(11)(B), 128 Stat. at 3795–96.

declaring that it "has the exclusive right to use, occupy and possess" the lands of the Preserve under its continuing aboriginal title. App. vol. 1, at 71.

In 2013, the district court dismissed the suit for lack of subject-matter jurisdiction. It held that the 1860 Act extinguished the Jemez Pueblo's claimed aboriginal title. If so, this meant that the Jemez Pueblo had overslept its sole remedy—a pre-1951 claim for compensation with the Indian Claims Commission ("ICC") as provided by the Indian Claims Commission Act ("ICCA").[5] In those circumstances, the district court held that sovereign immunity barred the Jemez Pueblo's QTA claim to the entire Valles Caldera.

We reversed and remanded for further proceedings. In directing the remand, we assumed—subject to the district court's ultimate say—that the Jemez Pueblo would be able to establish aboriginal title to the Valles Caldera before the 1860 Act. With that in mind, we held that "the 1860 grant by the United States of Baca Location No. 1 did not by itself extinguish aboriginal title of the Jemez Pueblo such that the Pueblo was required to bring a claim against the United States when Congress enacted the ICCA in 1946." *Id.* at 1170; *see also id.* at 1158 ("[A]lthough grants by the United States of land in possession of the Indians conveys fee title, the grant does not impair aboriginal title,

---

[5] The ICCA was enacted in 1946. *Jemez I*, 790 F.3d at 1152. It waived sovereign immunity and "created the [ICC], a quasi-judicial body to hear and determine all tribal claims against the United States that accrued before August 13, 1946. The ICCA imposed a five year statute of limitations period on Indian claims in law and equity then existing and arising under the Constitution, federal law, and treaties between Indian tribes and the United States." *Id.* (internal quotations and citations omitted). In 1978, Congress abolished the ICC and transferred all remaining cases to the Court of Federal Claims. *Navajo Tribe of Indians v. New Mexico*, 809 F.2d 1455, 1461 (10th Cir. 1987).

which the grantee must respect until aboriginal title has been extinguished by treaty, agreement, or other authorized actions of the Indians or Congress." (citation omitted)). We left it on remand for the government, if it chose, to show that federally authorized use of Baca Location No. 1 by the Baca heirs had substantially interfered with the Jemez Pueblo's traditional use of the land and thus extinguished the Jemez Pueblo's aboriginal title. *See id.* at 1168.

Back in district court after our remand, the Jemez Pueblo moved for partial summary judgment that it once and still had aboriginal title to two subareas of the Valles Caldera—Banco Bonito and Redondo Mountain. The district court denied this motion after finding genuine issues of material fact about whether the Jemez Pueblo had ever used those areas to the exclusion of other Indian groups.

Next, the district court held a twenty-one-day bench trial to determine whether the Jemez Pueblo had proved its QTA claim of aboriginal title to the entire Valles Caldera. There, the district court examined whether the Jemez Pueblo had established and continuously maintained aboriginal title to the lands of the Valles Caldera.

After trial, the district court issued a 530-page memorandum opinion. It concluded that though the Jemez Pueblo had met its burden to show continuous and actual use of the entire lands of the Valles Caldera for a long time, the Jemez Pueblo had failed to show use to the exclusion of other Indian groups. In support, the court noted that "for many centuries, non-Jemez Pueblo American Indians, including the ancestors of numerous modern Pueblos and federally recognized Tribes, wandered throughout and actually used the Valles Caldera . . . to sustain their aboriginal communities in ways substantially

9

similar to Jemez Pueblo." App. vol. 4, at 258. So, because it ruled that the Jemez Pueblo had never used the entire Valles Caldera to the exclusion of other Indian groups, the district court held that the Jemez Pueblo had never possessed aboriginal title to the entire area.

The Jemez Pueblo moved for reconsideration. But instead of asking the court to reconsider whether the Jemez Pueblo had aboriginal title to the entire Valles Caldera, it departed from its pleaded QTA claim and asked the court to reconsider a narrower question—whether the Jemez Pueblo had aboriginal title to four subareas within the Valles Caldera: (1) Banco Bonito; (2) Redondo Meadows; (3) the western two-thirds of the Valle San Antonio; and (4) the Paramount Shrine Lands. The Paramount Shrine Lands, according to the Jemez Pueblo, encompass the Jemez Pueblo Shrine on Redondo Peak, the Underworld Pilgrimage Trail leading to the Jemez Pueblo Shrine, and three springs along the trail.

The district court denied in part and granted in part the Jemez Pueblo's motion for reconsideration in a 192-page memorandum opinion. Under Federal Rule of Civil Procedure 59(e), the district court ruled that it could not reconsider the Jemez Pueblo's claims to the Redondo Meadows, part of the Valle San Antonio, and the Paramount Shrine Lands. This was so, the court said, because the Jemez Pueblo had pleaded and litigated a single claim for the entire Valles Caldera, not for any discrete areas. This meant that the Jemez Pueblo had failed to put the government on notice of its claims to three of the discrete areas (those other than Banco Bonito). In contrast, the court viewed the Jemez Pueblo's claim to Banco Bonito as one tried by consent because the Jemez

10

Pueblo's partial-summary-judgment motion had put the government on notice of that claim.

Even so, being thorough, the district court resolved the merits of the Jemez Pueblo's claims to the other three subareas. It held that the Jemez Pueblo could not establish that it ever had aboriginal title to the western two-thirds of Valle San Antonio or the Redondo Meadows because it had never used those subareas to the exclusion of other Indian groups. It further held that the Jemez Pueblo did not have aboriginal title to the features making up the Paramount Shrine Lands—the Jemez Pueblo Shrine, the trail, and the three springs—because the Jemez Pueblo had failed to establish that it ever had aboriginal title to the land surrounding those features.

The district court also rejected the Jemez Pueblo's claim to Banco Bonito. It began by concluding that the Jemez Pueblo had established "aboriginal title to Banco Bonito during the time it heavily farmed the area between the early fifteenth century and 1650." App. vol. 6, at 183. In deciding whether the Jemez Pueblo had ever lost that title, the court noted that even after 1650, when the Jemez Pueblo ceased farming Banco Bonito, "[1] another Tribe did not conquer Jemez Pueblo, [2] the United States did not extinguish title to any land on the Banco Bonito, and [3] Jemez Pueblo also did not completely abandon its Banco Bonito use." *Id.* at 184. Importantly, the district court emphasized that "[i]f Jemez Pueblo only had to show that it possessed aboriginal title at one point and

11

then never abandoned the land or had it extinguished, the Court would conclude that

Jemez Pueblo has established aboriginal title to Banco Bonito." *Id.* at 183.

Even so, believing *Jemez I* compelled its result, the district court denied the Jemez

Pueblo's claim of aboriginal title to Banco Bonito. The court ruled that the Jemez Pueblo

lost its aboriginal title after 1650 by not maintaining exclusive use of Banco Bonito to the

exclusion of other Indian groups. In that regard, the district court found that "after 1650,

with a much reduced presence on Banco Bonito and a smaller population, there is no

evidence that Jemez Pueblo was able to walk through Banco Bonito 'to the exclusion of

other Indian groups,' and there is some evidence that it could not." *Id.* at 185 (quoting

*Jemez I*, 790 F.3d at 1166). Though finding that the Jemez Pueblo had been the "primary

Indian group using the Banco Bonito over several centuries," the court further noted that

"the record also establishes that the Banco Bonito was 'wandered over by many tribes,'

*United States v. Pueblo of San Ildefonso*, [513 F.2d 1383, 1394 (Ct. Cl. 1975)], and that

Jemez Pueblo did not have the right or the power to expel any of these Indian groups." *Id.*

at 196. Thus, the district court held that sometime between 1650 and 1850, the Jemez

Pueblo lost its aboriginal title to Banco Bonito.[6]

## DISCUSSION

The Jemez Pueblo timely appealed the district court's order dismissing its QTA

claim for the entire Valles Caldera, as well as its order on the Jemez Pueblo's motion for

---

[6] The district court granted the Jemez Pueblo's request to delete one factual finding and amend three conclusions of law from the post-trial order. But none of those changes affected the court's resolution of the Jemez Pueblo's aboriginal-title claims.

reconsideration of the four subareas. But on appeal, the Jemez Pueblo has abandoned its claim to the entire Valles Caldera and contests the reconsideration ruling for just two of the subareas—Banco Bonito and the Paramount Shrine Lands. The Jemez Pueblo presents two issues about these two subareas meriting discussion: (1) whether the district court erred in concluding that the Jemez Pueblo has lost its established aboriginal title to Banco Bonito and (2) whether the district court erred in concluding that Rule 59(e) barred its reconsideration of its claim to the Paramount Shrine Lands and in its alternative ruling that the Jemez Pueblo does not have aboriginal title to the Paramount Shrine Lands.[7]

After explaining the applicable standard of review and providing an overview of the law of aboriginal title, we address each issue in turn.

## I.      Standard of Review

We review a district court's conclusions of law made after a bench trial de novo and its findings of fact for clear error. *Leathers v. Leathers*, 856 F.3d 729, 762 (10th Cir. 2017).

We review rulings on Rule 59(e) motions for an abuse of discretion. *Nelson v. City of Albuquerque*, 921 F.3d 925, 929 (10th Cir. 2019). "Under this deferential standard of

---

[7] The Jemez Pueblo raises two other issues. First, it contends that the district court erred by excluding certain tribal oral-tradition testimony as hearsay and by stating that it would have given any such testimony no weight anyway. Second, it argues that the district court erred in failing to apply "Indian canons of construction" when interpreting *Jemez I*, when weighing circumstantial evidence, and when evaluating the Jemez Pueblo's claim to the Paramount Shrine Lands. But because the resolution of these issues is unnecessary for the disposition of this appeal, we do not reach them. *Orr v. City of Albuquerque*, 417 F.3d 1144, 1154 (10th Cir. 2005).

review, we won't disturb the district court's ruling unless it was arbitrary, capricious, whimsical, or manifestly unreasonable." *Eaton v. Pacheco*, 931 F.3d 1009, 1027 (10th Cir. 2019) (citation and internal quotations omitted); *see also United States v. McComb*, 519 F.3d 1049, 1053 (10th Cir. 2007) (noting that under the abuse-of-discretion standard we "defer to the district court's judgment so long as it falls within the realm of these rationally available choices"). But an error of law per se constitutes an abuse of discretion. *United States v. Chavez-Meza*, 854 F.3d 655, 657 (10th Cir. 2017).

## II.     Aboriginal Title

The Supreme Court first recognized the aboriginal right of occupancy—known now as aboriginal title—in *Johnson v. M'Intosh*, 21 U.S. (8 Wheat.) 543 (1823).[8] Since then, the Court has repeatedly affirmed that a tribe's right of occupancy "is as sacred and as securely safeguarded as is fee simple absolute title." *United States v. Shoshone Tribe of Wind River Rsrv.*, 304 U.S. 111, 116–17 (1938); *see also Oneida County v. Oneida Indian Nation of N.Y. State*, 470 U.S. 226, 235 (1985); *United States v. Santa Fe Pac. R. Co.*, 314 U.S. 339, 345 (1941); *Mitchel v. United States*, 34 U.S. (9 Pet.) 711, 746 (1835).

Whether a tribe has aboriginal title to the land it claims is a fact question. *Jemez I*, 790 F.3d at 1165. To establish aboriginal title, the tribe has the burden to "show actual, exclusive, and continuous use and occupancy for a long time of the claimed area." *Id.* (internal citation and quotations omitted). To meet the "exclusive use" requirement, it

---

[8] We provided a detailed background of the history of aboriginal-title law in *Jemez I*, 790 F.3d at 1152–61.

must prove "that it used and occupied the land to the exclusion of other Indian groups."

*Id.* (emphasis removed and citation omitted).[9] And to meet the "actual" and "continuous

use" requirements, it must show that, for a long time,[10] its people have "use[d] the

[claimed land] for traditional purposes, including hunting, grazing of livestock, gathering

of medicine and of food for subsistence, and the like." *Id.* at 1166.

The Supreme Court has emphasized that a tribe's aboriginal title does not require

an affirmative act of the sovereign for its continued viability. *Santa Fe*, 314 U.S. at 347.

Once established, aboriginal title "endures until extinguished or abandoned." *Lipan*

*Apache Tribe v. United States*, 180 Ct. Cl. 487, 492 (1967); *see also Oneida Indian*

*Nation of N.Y. State v. Oneida County*, 414 U.S. 661, 667 (1974) (aboriginal title is "good

---

[9] The Court of Federal Claims has identified three exceptions to the general rule of exclusive use and occupancy: (1) the joint-and-amicable-use exception; (2) the dominated-use exception; and (3) the permissive-use exception. *Ala.-Coushatta Tribe of Tex. v. United States*, No. 3-83, 2000 WL 1013532, at *16 (Fed. Cl. June 19, 2000). Under the joint-and-amicable-use exception, two or more Indian tribes may maintain exclusive use of an area if the tribes have a strong political and social alliance. *Id.* Under the dominated-use exception, an Indian tribe may claim exclusive use where it "culturally assimilates another tribe or otherwise exercises complete dominion over scattered groupings of other Indians that appear few and far between in the claim area." *Id.* at *17 (internal quotations omitted). And under the permissive-use exception, other Indian tribes may wander over portions of the claimant tribe's land without defeating the exclusive-use requirement so long as the other groups' presence was with the claimant tribe's permission. *Id.* Our court has not yet considered these exceptions.

[10] In *Jemez I*, we noted that to meet the "for a long time" requirement to establish aboriginal title, the Jemez Pueblo needed to show continuous use of the Valles Caldera for "hundreds of years." 790 F.3d at 1166. In noting that, we did not mean to require continuous and actual use for "hundreds of years." Rather, we harkened to the complaint, which alleges aboriginal title to the Valles Caldera for over 800 years. *See* App. vol. 1, at 59–60. We clarify this to avoid future confusion.

15

against all but the sovereign" and "[can] be terminated only by sovereign act"); *Williams v. City of Chicago*, 242 U.S. 434, 437–38 (1917) (holding that any claim to aboriginal title was lost through the claimant tribe's failure to continuously occupy the claimed area); *Mitchel*, 34 U.S. at 713 (noting that Indian groups' "rights to its exclusive enjoyment in their own way and for their own purposes were as much respected, until they abandoned them, made a cession to the government, or an authorized sale to individuals"); *Seneca Nation of Indians v. New York*, 206 F. Supp. 2d 448, 518 (W.D.N.Y. 2002) ("Aboriginal title can either be retained by the tribe, abandoned by the tribe, or extinguished by the sovereign."), *aff'd*, 382 F.3d 245 (2d Cir. 2004); *Ala.- Coushatta Tribe*, 2000 WL 1013532, at *43 ("[A]boriginal title endures in perpetuity until it is appropriately extinguished by the sovereign or abandoned by the tribe."); *Wichita Indian Tribe v. United States*, 696 F.2d 1378, 1382 (Fed. Cir. 1983) (concurring with *Lipan Apache Tribe* in that "when a tribunal admits that a tribe holds aboriginal title to a tract of land, that tribunal cannot dismiss the case without a showing of abandonment or extinguishment"); Cohen's Handbook of Federal Indian Law § 15.04, at 1000 (Nell Jessup Newton et al. eds., 2012) [hereinafter Cohen's Handbook] ("Until title is extinguished, a tribe has the collective right to occupy and use its land as it sees fit.").

Only the sovereign may extinguish aboriginal title, whether "by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise." *Santa Fe*, 314 U.S. at 347. Extinguishment may also result indirectly through "white settlement and use, authorized by the federal government both statutorily and in fact." *Jemez I*, 790 F.3d at 1166 (citing *Pueblo of San Ildefonso*, 513

16

F.2d at 1393). But "[n]o matter the method used, the sovereign's intent to extinguish must be clear and unambiguous." *United States v. Abouselman*, 976 F.3d 1146, 1156 (10th Cir. 2020).

For abandonment to result in the loss of aboriginal title, it must be voluntary. *See Williams*, 242 U.S. at 437–38; Cohen's Handbook § 1509[1][b], at 1053 (noting that because aboriginal title is based on evidence of continuous possession, "a small number of cases have held that original Indian title can be lost through abandonment, but only if that abandonment is voluntary").

## III.    Banco Bonito

The Jemez Pueblo first argues that the district court abused its discretion in ruling that after 1650 the Jemez Pueblo lost its established aboriginal title to Banco Bonito by not using the area to the exclusion of other Indian groups. We agree that the district court's ruling was legal error and thus an abuse of discretion.

Because the district court premised its ruling on its interpretation of *Jemez I*, it helps to review that decision and explain why we disagree with the district court. We use block quotes because the precise language of *Jemez I* is important.

In *Jemez I*, this court proceeded step by step with the government's arguments. First, we rejected the government's position that the 1860 Act extinguished the Jemez Pueblo's asserted aboriginal title to the Valles Caldera:

> Absent clear and unambiguous intent by Congress to allow extinguishment of the aboriginal right of occupancy of the Jemez Pueblo, therefore, the grant of land to the Baca heirs was valid to convey the fee but the Baca heirs took the title subject to the Jemez Pueblo's aboriginal title. The government cites

17

us to no language in the 1860 Act to show the unambiguous intent of Congress to extinguish existing Indian title.

790 F.3d at 1162–63 (footnote omitted). But we further noted that the Baca-grant ruling did not necessarily mean that the Jemez Pueblo still maintained its asserted aboriginal title:

> As we have pointed out, Supreme Court decisions since 1823 make clear that the Baca grant at issue was subject to the Jemez Pueblo's aboriginal title— assuming the Jemez Pueblo maintained aboriginal possession at the time.

*Id.* at 1163.

Next, we addressed the government's alternative argument to its Baca-grant argument:

> The government counters that even if aboriginal title was not extinguished, the grant at least placed a cloud on the Jemez Pueblo's aboriginal title such that a claim accrued against the United States in 1860. The government asserts that the Baca's use of the land is inconsistent with the Pueblo's aboriginal title.

*Id.* at 1165. We rejected the government's assertion by noting that "simultaneous occupancy and use of land pursuant to fee title and aboriginal title could occur because the nature of Indian occupancy differed significantly from the occupancy of settlers[.]" *Id.* For the simultaneous use to defeat the Jemez Pueblo's aboriginal title, the district court would have to find that the Baca heirs' use substantially impaired the Jemez Pueblo's right to use and occupancy. *See id.* at 1168.

We then turned to the remand. In the paragraph most at issue on appeal, we commented on the two analytical steps remaining in the district court—(1) whether the Jemez Pueblo could establish aboriginal title to the Valles Caldera by its actual,

continuous, and exclusive use of the land for a long time and (2) if so, whether the Jemez

Pueblo maintained that aboriginal title until it filed its QTA claim:

> Whether the Jemez Pueblo can establish that it exercised its right of aboriginal occupancy to these lands in 1860 and thereafter is a fact question to be established on remand, where it will have the opportunity to present evidence to support its claim. To do so, it must show "'actual, exclusive, and continuous use and occupancy 'for a long time' of the claimed area." *Native Vill. of Eyak v. Blank*, 688 F.3d 619, 622 (9th Cir. 2012) (quoting [*Sac & Fox Tribe of Indians of Okla. v. United States*, 383 F.2d 991, 998 (Ct. Cl. 1967)]). The government contends the Jemez Pueblo cannot prove "exclusive" use because the Baca heirs used the land. But the "exclusive" part of the test meant only that in order to establish aboriginal title, a tribe "must show that it used and occupied the land to the *exclusion of other Indian groups*." *Pueblo of San Ildefonso*, 513 F.2d at 1394 (emphasis added); *see also Native Village of Eyak*, 688 F.3d at 624 ("Exclusivity is established when a tribe or a group shows that it used and occupied the land to the *exclusion of other Indian groups*."); *Zuni Tribe of N.M. v. United States*, 12 Cl. Ct. 607, 608–09, 617–20 & nn. 13–15 (1987) (holding Zuni exclusively used and occupied lands where no evidence other tribes used and occupied lands); *Wichita Indian Tribe v. United States*, 696 F.2d 1378, 1385 (Fed. Cir. 1983) ("Clearly, the northern two-thirds of Oklahoma where the Osage also hunted cannot have been used exclusively by the Wichitas. Lands continuously wandered over by adverse tribes cannot be claimed by any one of those tribes."); *Caddo Tribe of Okla. v. United States*, 35 Ind. Cl. Comm. 321, 358–60 (1975) (exclusivity established where Tribe "exercised control over [the claimed area] and over other Indians who may have ventured therein").

*Id.* at 1165–66.

The initial part of the first sentence ties to the immediately preceding discussion

on simultaneous use by the Jemez Pueblo and the Baca heirs. This sentence declares an

obvious point—that the Jemez Pueblo's QTA claim would fail if the Jemez Pueblo had

not actually used its right to occupancy continuously from 1860 through its filing of the

QTA claim in 2000. And this sentence notes that the district court must resolve this fact

question on remand. If the Jemez Pueblo ceased using the claimed lands before 2000, it

could not even show continuous, simultaneous use with the Baca heirs. Its abandonment of the lands would end its claim to aboriginal title altogether. *See* Cohen's Handbook § 1509[1][b], at 1053 (aboriginal title may be lost in the absence of continuous possession).

The latter part of the first sentence notes that on remand the Jemez Pueblo "will have the opportunity to present evidence to support its claim." *Pueblo*, 790 F.3d at 1165. Here lies the fork in the interpretive roadway. In deciding what "its claim" means, we must remember that in its complaint, the Jemez Pueblo pleaded a QTA claim. The Jemez Pueblo needed to support that claim in district court. In the upcoming proceeding after remand, the Jemez Pueblo would need to show two things to support its QTA claim: (1) that it once held aboriginal title to Banco Bonito[11] and (2) that it continued to hold it.

We began the second sentence, "To do so." To do what? To present evidence to support its QTA claim. The Jemez Pueblo would do that by presenting evidence to support the two requirements above. As *Jemez I* says next, the Jemez Pueblo would need to "show actual, exclusive, and continuous use and occupancy for a long time of the claimed area." *Id.* (internal quotations and citation omitted). Rejecting a government argument, *Jemez I* cemented that the "exclusive" use and occupancy part of the test applied to establishing aboriginal title, not maintaining it: "[T]he 'exclusive' part of the test meant only that in order *to establish aboriginal title*, a tribe 'must show that it used

---

[11] We expressed no opinion on whether on remand the Jemez Pueblo could establish aboriginal title to the Valles Caldera. *Jemez I*, 790 F.3d at 1163 n.15.

and occupied the land to the *exclusion of other Indian groups*.'" *Id.* at 1166 (citation

omitted; first emphasis added). Reinforcing this point, *Jemez I* cites a string of cases

applying the test for *establishing* aboriginal title.[12]

The district court never got to the interpretive fork of *Jemez I*—its use of the term

"its claim." Instead, rearranging phrases from *Jemez I*, it analyzed whether the Jemez

Pueblo had maintained "'actual[,] exclusive, and continuous use and occupancy for a

long time of the claimed area,' '*in 1860 and thereafter*.'" App. vol. 6, at 185 (emphasis

added) (quoting *Jemez I*, 790 F.3d at 1165). The district court never acknowledged that

the Jemez Pueblo had two required showings before the Jemez Pueblo could satisfy the

title-holding requirement of its QTA claim. The district court apparently believed that the

Jemez Pueblo couldn't legally *exercise* its right of aboriginal occupancy without

*reestablishing* its already-established aboriginal title.[13] This rewrites *Jemez I*, which did

not adopt a use-it-exclusively-or-lose-it-entirely rule.

Had *Jemez I* erected such a stringent hurdle for the Jemez Pueblo and future Indian

---

[12] And in considering whether the Jemez Pueblo could *establish* aboriginal title, we rejected the government's view that conduct of the Baca heirs would matter. *See Jemez I*, 790 F.3d at 1166–67 ("The government contends the Jemez Pueblo cannot prove 'exclusive' use because the Baca heirs used the land."). By then, we had already rejected the government's argument that simultaneous use between the Jemez Pueblo and the Baca heirs "is inconsistent with the Pueblo's aboriginal title." *Id.* at 1165.

[13] As mentioned, that would require the Jemez Pueblo to show that it had the right or power to expel other Indian groups wandering onto land for which it had already established aboriginal title. Elsewhere, the court voiced disapproval of a power-to-expel requirement:

tribe litigants to overcome, it would have upended most aboriginal titles. But it did not.

After *Jemez I*, as before it, a tribe seeking to quiet title based on asserted aboriginal title

must meet two requirements. First, the tribe must establish aboriginal title by showing

actual, exclusive, and continuous use and occupancy for a long time. *Native Vill. of Eyak*,

688 F.3d at 622; *see also Abouselman*, 976 F.3d at 1156. Second, the tribe must show

that after establishment it did not lose its aboriginal title either through (1)

extinguishment by the sovereign or (2) voluntary abandonment. *See Wichita*, 696 F.2d at

1382 ("[W]hen a tribunal admits that a tribe holds aboriginal title to a tract of land, that

tribunal cannot dismiss the case without a showing of abandonment or

extinguishment[.]"); *Abouselman*, 976 F.3d at 1156 ("Once established . . . aboriginal

title remains until it is extinguished, and as against any but the sovereign, original Indian

---

If it were writing on a clean slate, the Court believes that Tribes and Pueblos should not have to demonstrate that they had the power to exclude other completely hypothetical Indian groups that wandered onto their land. This requirement would have allowed the United States to seize the land of any isolated Tribe if the Tribe was relatively weak, thereby reserving aboriginal title only to relatively powerful tribes. Requiring proof of the power to exclude is at odds with foundational aboriginal title cases, which unreservedly protect lands Indian groups exclusively occupy. *See Cherokee Nation v. Georgia*, [30 U.S. 1, 32 (1831)] (stating that "the Indians are acknowledged to have an unquestionable, and heretofore unquestioned, right to the land they occupy, until that right shall be extinguished by a voluntary cession to our government"); *Johnson v. M'Intosh*, 21 U.S. at 574 (stating that aboriginal title makes a Tribe's members "the rightful occupants of the soil, with a legal as well as just claim to retain possession of it").

App. vol. 6, at 173.

title was accorded the protection of complete ownership." (cleaned up)).[14]

Though aboriginal title grants a tribe only "a right of occupancy," "not a property right," *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 279 (1955), the Supreme Court has repeatedly stressed that "[t]he right of perpetual and exclusive occupancy of the land *is not less valuable than full title in fee*." *Shoshone Tribe*, 304 U.S. at 116 (emphasis added); *see also Mitchel*, 34 U.S. at 746 (affirming the notion that aboriginal title is "as sacred as the fee simple of the whites"). A continuing-exclusivity requirement would conflict with this principle, as it would almost certainly keep a tribe from establishing aboriginal title into the modern era. The options available—violence against other trespassing tribes (likely on land owned by the United States or white settlers) or filing a civil suit against a trespassing tribe—would be unrealistic for obvious reasons.[15]

The government argues that the Jemez Pueblo could meet its proposed exclusive-use requirement from 1650 to 2000 "by dominating other tribes that enter the claimed area without actually attacking them." Response Br. 34. This so-called dominant-use

---

[14] The district court and the Jemez Pueblo raise the possibility that a tribe loses aboriginal title if another tribe conquers it. That may be so, but as such conquering has not been alleged here, we need not discuss it.

[15] We note that until the middle of the twentieth century, "few Indian tribes maintained any semblance of a formal court system." *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 197 (1978), *superseded by statute on other grounds as stated in United States v. Lara*, 541 U.S. 193, 207 (2004). And though the Supreme Court held in 1850 "[t]hat an action of ejectment could be maintained on an Indian right to occupancy and use," that case and those that affirmed its sentiment were referring to a tribe's right to sue trespassing white settlers, not other Indians. *Marsh v. Brooks*, 49 U.S. (8 How.) 223, 232 (1850). Further, even if the courts had been open to the Jemez Pueblo when its use allegedly became non-exclusive as to other tribes, it's far from clear that the courts would have entertained suits from them.

exception to the exclusivity requirement recognizes that when another tribe uses the claimed area in common with the claimant tribe, proof of the claimant tribe's *ability to exclude* other tribes from the area preserves its exclusive use of the land even if not exercised. *See United States v. Seminole Indians of Fla.*, 180 Ct. Cl. 375, 383–86 (1967) (holding that the Seminoles demonstrated their domination of a claimed area by "simply absorbing . . . into their own ranks" the "scattered groupings" of other tribes). But the government itself admits that this exception is subject to a high standard and rarely succeeds. And, in any event, the government fails to cite a case applying the dominant-use exception *after* a tribe long since established aboriginal title.

Moreover, it strikes us as altogether unjust for the date of the alleged government interference to serve as a triggering point for a required re-establishment of aboriginal title—or any date after initial establishment for that matter. *See Santa Fe*, 314 U.S. at 347 (explaining that aboriginal title preexists the formation of the United States and requires no affirmative act of the sovereign for its continued viability). A simple hypothetical illustrates why. Let's say that Tribe X established aboriginal title by proving actual, exclusive, and continuous use and occupancy of a tract of land between 1700 and 1900. Between 1900 and 1902, Tribe X continued to use the land, but Tribe Z began to traverse over the land—peacefully, but without Tribe X's permission or knowledge. In 1902, the United States purchased the land from private owners to create a national park without extinguishing Tribe X's claimed aboriginal title. Under a continuing-exclusivity-of-use rule, Tribe Z's wanderings between 1900 and 1902 would deprive Tribe X of its aboriginal title absent constant monitoring of its borders and the use of violence to expel

24

Tribe Z intruders.

The government cites a passage in *Jemez I* rejecting its position that white-settler activity plays a role in assessing the establishment of aboriginal title. It now seeks to rely on three cases we cited there as having evaluated an "exclusive-use requirement" continuing past the tribe's establishment of aboriginal title and through the date of the alleged government interference. Response Br. 30.[16] But none of these out-of-circuit cases persuade us of any such requirement.

The first case is *Pueblo of San Ildefonso*, an appeal heard by the United States Court of Claims from the ICC. 513 F.2d 1383. The primary issue on appeal was when the government extinguished established aboriginal title. *Id.* at 1386–92. The secondary issue was whether two tribes could jointly occupy an area of land and still meet the exclusive-use requirement for the establishment of aboriginal title. *Id.* at 1392–96. On the second issue, the court answered affirmatively, noting that the two claimant tribes had "jointly used and occupied the disputed 8,600 acre tract for a long period of time." *Id.* at 1395. Thus, it concluded that the tribes had "joint aboriginal title." *Id.* This case is ultimately not germane to the Jemez Pueblo's appeal. That is because the court never analyzed when

---

[16] The government cites three other cases in support of this requirement, but none of them discuss exclusive use against other Indian groups and are thus inapposite. *See United States v. Alcea Band of Tillamooks*, 329 U.S. 40, 44 (1946) (explaining that the date of extinguishment is "the date the Indians lose the land through treaty or otherwise"); *United States v. Dann*, 873 F.2d 1189, 1199–1200 (9th Cir. 1989) (noting that the Indian tribe must continue to occupy the claimed area until the date of extinguishment); *Sac & Fox*, 383 F.2d at 998–99 (noting that an Indian group may *initially* establish aboriginal title at any point before the date of extinguishment).

aboriginal title was first established, or whether that title could be lost *post-establishment* through the trespass of other tribes.

Next, the government cites *Zuni Tribe of New Mexico v. United States*, 12 Cl. Ct. 607 (1987). In *Zuni Tribe*, the United States Claims Court determined that the Zuni had established aboriginal title "from time immemorial beginning as early as 5,000 B.C. (at the latest) and continuing through and including at least 1846." *Id.* at 641. The Zuni sought compensation for "takings" committed by the United States and other tribes between 1846 and 1939. In the present appeal, the government emphasizes (1) that the *Zuni Tribe* court evaluated whether other tribes had used the claimed area before the date of the asserted "takings" and (2) that the court concluded that the presence of other Indians on the lands did not "detract[] from the exclusivity of the Zuni use and ownership." *Id.* We acknowledge that the case supports the government's position. But in conducting a post-establishment exclusive-use analysis, we note that the *Zuni Tribe* court put the Zuni's claim to aboriginal title to a far greater test than the Supreme Court has. We have not and will not.[17]

Last, the government cites *Wichita*, a case from the Federal Circuit. 696 F.2d 1378. In *Wichita*, the United States Claims Court determined that the Wichita Tribe had

---

[17] Somewhat relatedly, the government briefly argues that if "first use prevails unless the opposing party proves complete abandonment or extinguishment, Zia [another tribe] would hold aboriginal title to Banco Bonito as its use preceded Jemez's use, continued through 2000, and no sovereign extinguished its aboriginal title." Resp. Br. 32 (internal citation omitted). But this isn't about "first use." As the district court noted when it rejected this argument, "whether a Tribe was the first occupant of certain land is ultimately irrelevant to whether the Tribe established aboriginal title to the land." App. vol. 6, at 186 n.85.

established aboriginal title to land in Oklahoma. But it ultimately "concluded that a general abandonment by the Wichitas of perhaps *most* of the claimed lands in Oklahoma effectively prevented them from recovering for the loss of *any* lands there." *Id.* at 1380. The Federal Circuit deemed the Claims Court's abandonment analysis incomplete. *Id.* Thus, it remanded the case for a more thorough analysis of abandonment and an exact "determination of the extent of aboriginal title to lands in Texas and Oklahoma." *Id.* at 1386.

The government relies on several portions of *Wichita*'s "Abandonment" section in which the Federal Circuit may suggest, without supporting authority, that a tribe can lose aboriginal title by abandonment or extinguishment if another tribe establishes settlements on the claimed land or if the claimant tribe is "forced to share portions of [the] area with others." *Id.* at 1382–83. But as already explained in depth, another tribe's actions are irrelevant to the abandonment and extinguishment analyses. They figure only in the establishment of aboriginal title. Thus *Wichita*—and its imprecise language—does not aid the government.

In sum, because the district court found (1) that the Jemez Pueblo established aboriginal title to Banco Bonito by 1650 and (2) that its aboriginal title hasn't been abandoned by the Jemez Pueblo or extinguished by the United States, the Jemez Pueblo continues to hold aboriginal title to Banco Bonito.[18] *See* App. vol. 6, at 183 ("If Jemez

---

[18] In its reply brief, the Jemez Pueblo argues that in holding that it lost title to Banco Bonito, the district court "violates the Indian Non-Intercourse Act, 25 U.S.C. § 177, which prohibits any 'conveyance of lands, or any title or claim thereto . . .

Pueblo only had to show that it possessed aboriginal title at one point and then never abandoned the land or had it extinguished, the Court would conclude that Jemez Pueblo has established aboriginal title to Banco Bonito.").

In reading *Jemez I* otherwise, the district court abused its discretion. We therefore reverse the district court on this issue and remand with instructions to enter judgment consistent with this opinion.

## IV.    Paramount Shrine Lands

We move next to the Jemez Pueblo's argument that the district court abused its discretion in denying its Rule 59(e) motion for reconsideration as to its claim to the Paramount Shrine Lands. This argument is meritless.

"Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). So a motion for reconsideration is properly granted only when "the court has misapprehended the facts, a party's position, or the controlling law." *Id.*

"But once the district court enters judgment, the public gains a strong interest in protecting the finality of judgments." *Nelson*, 921 F.3d at 929. Because of that strong interest, we have circumscribed when district courts may grant motions for reconsideration. We've repeatedly said that these motions are "not appropriate to revisit

---

unless the same be made by treaty or convention entered into pursuant to the Constitution.'" Reply Br. 12. But the Jemez Pueblo failed to make this argument in its opening brief, so we decline to consider it. *See United States v. Mullikin*, 758 F.3d 1209, 1210 n.2 (10th Cir. 2014).

issues already addressed or advance arguments that could have been raised in prior briefing." *Id.* (quoting *Servants of Paraclete*, 204 F.3d at 1012). The Supreme Court has emphasized the same point: "Rule 59(e) permits a court to alter or amend a judgment, but it 'may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.'" *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (citation omitted).

The district court characterized the Jemez Pueblo's claim to the subarea of the Paramount Shrine Lands (as well as its claim to the Redondo Meadows and Valle San Antonio) as "arguments that could have been but were not raised" before the court issued judgment as to all of the Valles Caldera. App. vol. 6, at 163 (quoting *Banister v. Davis*, 140 S. Ct. 1698, 1708 (2020)). The district court noted that in the seven years of litigating its claim pre-final judgment, the Jemez Pueblo had never argued its entitlement "to each discrete cultural polygon in the Valles Caldera and instead premised its aboriginal title claims to the Valles Caldera as a whole." *Id.*

The court rejected the Jemez Pueblo's contention that through its complaint, its interrogatory answers, and the depositions the government took of Jemez witnesses, the government was on notice of its claims to the subareas and thus tried them by consent. In the district court's view, the complaint's references to the subareas were too general to provide notice, particularly as the complaint was framed as a challenge to the entire Valles Caldera. As for the Jemez Pueblo's interrogatory answers, the district court acknowledged that they reference the geographic areas that the Jemez Pueblo sought in its motion for reconsideration. But the court found that insufficient for notice. That is

because the answers "respond to a limited question within the dispute that the Complaint frames" and do not suggest that the Jemez Pueblo would later seek title to certain subareas. *Id.* at 167. And as for the depositions, the court determined that they failed to provide notice because no deposition cited by the Jemez Pueblo included discussion of the subareas at issue.[19]

The district court further noted that Federal Rule of Civil Procedure 15(b)(2) did not permit the reconsideration of the Jemez Pueblo's claim to the Paramount Shrine Lands. Rule 15(b)(2) provides that issues not raised by the pleadings may be tried by the parties' express or implied consent. But the district court explained that Rule 15(b)(2) doesn't allow a plaintiff to reframe its claim after the fact. And to allow the Jemez Pueblo to do that in this case would prejudice the United States, which had structured its opposition based on the pleadings that sought title to the entire Valles Caldera.

We agree with the district court's thorough analysis on this issue. The Jemez Pueblo centered its claim and its request for relief in its complaint on the *entire* Valles Caldera—not discrete subparts. App. vol. 1, at 71 ("The aboriginal Indian title and right of possession, use and occupancy of the lands of the Valles Caldera National Preserve remain in Jemez Pueblo."); *id.* at 71–72 ("Wherefore, Plaintiff prays that the court grant

---

[19] The Jemez Pueblo contends that the district court erroneously limited its analysis of the notice it gave the government to its prayer for relief in its complaint and required the Jemez Pueblo to allege "precise subareas within the great area." Opening Br. 36–37. But as shown by our discussion, the district court did no such thing. Rather, it considered whether the Jemez Pueblo had provided notice of this claim in its complaint or during discovery. In addition, we note that the district court *did* conclude that the Jemez Pueblo provided notice to the government of its claim to Banco Bonito in its motion for partial summary judgment.

relief as follows: 1. Enter a judgment . . . that Plaintiff has the exclusive right to use, occupy and possess the lands of the Valles Caldera National Preserve pursuant to its continuing aboriginal Indian title to such lands."). And though the Jemez Pueblo used its motion for summary judgment as an opportunity to seek title specifically to Banco Bonito and Redondo Mountain as a whole, for unknown reasons it did not include the specific features of the Paramount Shrine Lands in that request. Based on the Jemez Pueblo's Complaint and how the pretrial-motion practice transpired, the district court correctly considered and adjudicated the Jemez Pueblo's claim to the entire Valles Caldera— nothing else.

In response to our questions at oral argument, the Jemez Pueblo submitted a Rule 28(j) Letter with citations in support of its assertion that the government had notice of its claim to the Paramount Shrine Lands pretrial. After independently reviewing those citations, we remain unconvinced that the district court's conclusion that the government lacked appropriate notice of the Jemez Pueblo's claim to the Paramount Shrine Lands was "arbitrary, capricious, whimsical, or manifestly unreasonable." *Eaton*, 931 F.3d at 1027. The same is true of the district court's conclusion that the government would be prejudiced if after many years of discovery and litigation aimed at challenging the Jemez Pueblo's claim to the entire Valles Caldera, it would be forced to renew, redouble, and refocus its discovery efforts for a distinct cause of action. We thus affirm the district

31

court's denial of the Jemez Pueblo's motion for reconsideration of its title to the Paramount Shrine Lands.

We also briefly address one other concern related to the scope of this issue. In a footnote in its reply brief, the Jemez Pueblo argues that the government incorrectly frames the Jemez Pueblo's appeal of this issue as one solely concerning the district court's denial of its Rule 59(e) motion for reconsideration. Reply Br. 14 n.9. The Jemez Pueblo insists that this is an incorrect framing because it appealed both the district court's post-trial order and its order on the Jemez Pueblo's motion for reconsideration, "as both wrongly failed to award a smaller portion of the original property claim as discussed herein." *Id.*

The Jemez Pueblo did indeed timely appeal both orders. But the Jemez Pueblo's opening brief does not substantively challenge the district court's post-trial order. This is shown by its opening paragraph for its discussion of this issue, which summarizes the Jemez Pueblo's challenge as one to: (1) the district court's ruling in *its order on the Jemez Pueblo's motion for reconsideration* that the Jemez Pueblo failed to provide notice to the government of its claim to the Paramount Shrine Lands; and (2) the district court's ruling in *its order on the Jemez Pueblo's motion for reconsideration* that the Jemez Pueblo must prove Indian title to lands surrounding the Paramount Shrine Lands. Moreover, on this issue, the Jemez Pueblo cites only the post-trial order when listing undisputed factual findings. In light of that, we restrict our review of this issue to the district court's order on the Jemez Pueblo's motion for reconsideration. *See Bronson v. Swensen*, 500 F.3d 1099, 1104

(10th Cir. 2007) ("Consistent with [Federal Rule of Appellate Procedure 28(a)(9)(A)], we routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief."); *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016) ("A party's offhand reference to an issue in a footnote, without citation to legal authority or reasoned argument, is insufficient to present the issue for our consideration.").

In any case, to the extent that the Jemez Pueblo argues that the district court erred by failing to award the Jemez Pueblo title to the Paramount Shrine Lands in its initial post-trial order, that argument fails for the reasons discussed. Namely, we do not fault the district court for adjudicating the Jemez Pueblo's claim *as presented* before and at trial: as one to the entire Valles Caldera. We express no opinion on whether to establish title to features of the Paramount Shrine Lands, the Jemez Pueblo had to show that it had aboriginal title "to the surrounding land." App. vol. 6, at 172.

## CONCLUSION

For these reasons, we conclude that the Jemez Pueblo has continuing aboriginal title to Banco Bonito. Thus, we reverse in part the denial of the Jemez Pueblo's motion for reconsideration, and we vacate in part and remand with instructions to the district court to enter judgment consistent with this opinion. We affirm as to all other issues raised.

20-2145, *Pueblo of Jemez v. United States*

**MORITZ**, Circuit Judge, concurring in part and dissenting in part.

In this quiet-title appeal, the Pueblo of Jemez (Jemez Pueblo) asserts aboriginal title to two areas within the Valles Caldera National Preserve (the Preserve) in New Mexico: (1) the Paramount Shrine Lands and (2) Banco Bonito. I agree with the majority that the district court properly rejected the claim to the Paramount Shrine Lands on procedural grounds because Jemez Pueblo failed to raise this narrower and more specific claim until more than seven years after commencing this action, and then only after losing at trial on its much broader claim to the entire Preserve. But I diverge from the majority because I would reject Jemez Pueblo's assertion of aboriginal title to Banco Bonito. I would do so based on the simple, undisputed, and dispositive fact that despite Jemez Pueblo's exclusive and continuous use of the area from approximately 1300 to 1650, other Indian tribes have used Banco Bonito for the more than 350 years since that time and up until 2000, when the United States allegedly began interfering with Jemez Pueblo's aboriginal right. Because the majority's contrary analysis—which relies upon a snapshot-in-time approach to aboriginal title—cannot be squared with precedent or basic aboriginal-title principles and could create untold new claims related to federal lands once occupied by Indian tribes, I respectfully dissent.

## Analysis

Jemez Pueblo asserts that since 2000, when Congress created the Preserve, the government has been interfering with Jemez Pueblo's aboriginal title to Banco

Bonito. Jemez Pueblo thus seeks to quiet title to Banco Bonito under the Quiet Title Act (QTA), which requires proof that Jemez Pueblo possessed aboriginal title to the disputed area when the government's alleged interference began. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (describing QTA claim as "a suit by a plaintiff asserting a 'right, title, or interest' in real property that conflicts with a 'right, title, or interest' the United States claims" (quoting 28 U.S.C. § 2409a(d))). Everyone agrees that to prove such possession, Jemez Pueblo must show that it actually, exclusively, and continuously used Banco Bonito "for a long time." *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1165 (10th Cir. 2015) (*Jemez I*) (quoting *Native Vill. of Eyak v. Blank*, 688 F.3d 619, 622 (9th Cir. 2012)). No one disputes, moreover, that Jemez Pueblo's claim turns on exclusivity—whether Jemez Pueblo "used and occupied the land to the exclusion of other Indian groups." *Id.* at 1165–66 (emphasis omitted) (quoting *United States v. Pueblo of San Ildefonso*, 513 F.2d 1383, 1394 (Ct. Cl. 1975)). And crucially, Jemez Pueblo does not seriously dispute the district court's finding that Jemez Pueblo's use *has not been exclusive for the last 350-plus years*: Although it was the only tribe using Banco Bonito from around 1300 to 1650, other tribes have also used the area in the centuries that followed. The majority and I part ways on whether this undisputed factual finding makes a legal difference to Jemez Pueblo's assertion of aboriginal title. As explained below, caselaw and basic aboriginal-title principles convince me that it does—Jemez Pueblo must prove that its exclusive use extended to the date of the alleged interference.

2

At the outset, contrary to the majority's view, both *Jemez I* and the cases it cites support the conclusion that a tribe's use must remain exclusive through the date of alleged interference. To be sure, our decision in *Jemez I* did not specifically address this aspect of exclusivity. Indeed, we assumed for purposes of resolving the appeal that Jemez Pueblo could prove exclusivity (as well as the other necessary elements) and left for remand the "fact question" of whether Jemez Pueblo could establish aboriginal title. 790 F.3d at 1165; *see also id.* at 1163 n.15 ("We express no opinion on whether, on remand, the Jemez Pueblo can factually establish aboriginal possession to the land it claims."). Given this assumption, anything *Jemez I* said about the nature of the exclusive-possession requirement is dicta. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 272 (1990) (explaining that when courts resolve legal issues by "assuming without deciding the validity of antecedent propositions, . . . such assumptions . . . are not binding in future cases that directly raise the question" (citations omitted)). Nevertheless, as the district court correctly ascertained, several statements from our opinion at least suggest that Jemez Pueblo cannot assert aboriginal title to Banco Bonito unless its use remained exclusive up until the government's alleged interference. In particular, we stated that Jemez Pueblo would need to prove on remand that it "*maintained* aboriginal possession" and "exercised its right of aboriginal occupancy to these lands in 1860 *and thereafter*."[1] *Jemez I*, 790 F.3d at 1163, 1165 (emphases added); *see also id.* at 1147

---

[1] The quote above refers to 1860 because that is the year Congress conveyed fee title to the land at issue to private owners, a move the government argued had

3

("On remand, . . . Jemez Pueblo will have to prove that it had, *and still has*, aboriginal title to the land at issue . . . ." (emphasis added)).

These references to maintaining aboriginal title are consistent with *Jemez I*'s cited caselaw, which requires actual, exclusive, and continuous use and occupancy as of the relevant date of alleged interference.[2] The court in *Pueblo of San Ildefonso*, for example, considered whether a tribe had aboriginal title "at the time the lands [in question] were included in" an executive order extinguishing such title. 513 F.2d at 1395; *see also id.* at 1394–95 (upholding finding that tribe's use continued "from at least 1770 down to June 13, 1902," the date on which President Theodore Roosevelt signed executive order extinguishing title).[3] In *Zuni Tribe of New Mexico v. United States*, the court similarly analyzed the necessary elements—including exclusivity—

---

extinguished Jemez Pueblo's aboriginal title and thus triggered the Indian Claims Commission Act's five-year statute of limitations. *See* 790 F.3d at 1147; Act of Aug. 13, 1946, ch. 959, Pub. L. No. 79-726, § 12, 60 Stat. 1049, 1052 (1946) (allowing tribes to bring claims against United States that accrued before 1946 so long as tribes brought such claims within five years of 1946).

[2] These cases mostly come from a (now-defunct) claims court tasked with adjudicating aboriginal-title claims and from the Federal Circuit, the court designated to hear appeals from the claims court. Although these decisions are nonbinding, our prior decision heavily relied on them, and the parties do not question their applicability here. *See Jemez I*, 790 F.3d at 1165–68, 1170–71.

[3] Jemez Pueblo downplays *Pueblo of San Ildefonso* because the court made no "determination of when aboriginal title was first established." Rep. Br. 4 n.3. But that purported distinction is immaterial. What matters is that the court assessed the elements of aboriginal title, including exclusive use, over the entire historical timeline, up to the point of government interference. *See Pueblo of San Ildefonso*, 513 F.2d at 1394 (explaining that tribe must show those elements were met "'for a long time' *prior to the loss of the land*" (emphasis added) (quoting *Confederated Tribes of the Warm Springs Rsrv. of Or. v. United States*, 177 Ct. Cl. 184, 194 (1966))).

4

from when the claimant tribe's use began (around 5,000 B.C.) and "continuing through" 1846, the year the alleged interference began. 12 Cl. Ct. 607, 641 (1987); *see also id.* at 617–41 (making exclusivity findings for each historical time period leading up to alleged 1846 date of interference; finding that by that date, claimant tribe "continued to have exclusive use and occupation of the claim area").[4] And in *Wichita Indian Tribe v. United States*, the Federal Circuit recognized that a lower court needed to assess whether a claimant tribe that used an area exclusively for an initial period had also continued to do so because evidence of adverse use from other tribes in later years would mean that the claimant tribe "failed to *retain* aboriginal title" until the government's interference took place. 696 F.2d 1378, 1382 (Fed. Cir. 1983); *see also id.* at 1385 (explaining that claimant tribe would lack aboriginal title to areas it "shared" with other tribes, as "[l]ands continuously wandered over by adverse tribes cannot be claimed by any one of th[em]"; recognizing that other tribes' use could "disrupt[]" or "impinge[] on" claimant tribe's "exclusivity of use").[5] In

---

[4] Jemez Pueblo criticizes *Zuni* for finding that aboriginal title had been "taken" based on circumstances that, in its view, do not satisfy the Supreme Court's requirements for extinguishing aboriginal title. Even if that's true, however, the point remains that the court assessed exclusivity through the dates of the allegedly interfering acts. That *Zuni* may have erred in treating some of those acts as rising to the level of extinguishment does not detract from the court's proper focus on whether the tribe's use remained exclusive up to the date the interference began.

[5] *Wichita Tribe* arguably framed this conclusion in terms of adverse tribal use resulting in the *loss* of aboriginal title. *See* 696 F.2d at 1385. But whether framed as a failure to acquire or a failure to retain, the result is the same: Jemez Pueblo lacks aboriginal title to Banco Bonito because its use was not exclusive at any time during the 350 years leading up to the government's interference. Responding to the latter framing, the majority concludes that Jemez Pueblo could lose aboriginal title only through sovereign extinguishment or voluntary abandonment. But the cases it offers

5

short, these cases suggest that a tribe's aboriginal use must be exclusive "'for a long time' prior to" the government's interference. *Pueblo of San Ildefonso*, 513 F.2d at 1394 (quoting *Confederated Tribes of Warm Springs Rsrv.*, 177 Ct. Cl. at 194). Exclusive use for a long time at some other point in history is insufficient.

In my view, therefore, the majority opinion errs when it presumes that the phrase "for a long time" is untethered to any particular event. It's good enough, the majority reasons, for a tribe to simply show that it had exclusive and continuous use

---

to support that view do not provide an exhaustive list of how loss can occur; each one involved an extinguishment or abandonment issue and thus had no reason to consider whether other circumstances could also result in loss. *See, e.g.*, *Lipan Apache Tribe v. United States*, 180 Ct. Cl. 487, 491–92 (1967) (holding that lack of sovereign recognition did not extinguish aboriginal title); *Alabama-Coushatta Tribe of Tex. v. United States*, No. 3-83, 2000 WL 1013532, at \*13, \*43–53 (Fed. Cl. June 19, 2000) (considering "whether aboriginal title was extinguished"); *Mitchel v. United States*, 34 U.S. (9 Pet.) 711, 746–48 (1835) (determining that extinguishment occurred when Spain ratified tribe's sale of land to private owners); *Williams v. City of Chicago*, 242 U.S. 434, 437–38 (1917) (holding that tribe abandoned aboriginal title to lands it had not occupied "for more than a half century"); *Oneida Indian Nation of N.Y. v. Cnty. of Oneida*, 414 U.S. 661, 667 (1974) (noting general aboriginal-title principles when explaining why tribe's claim arose under federal law for purposes of subject-matter jurisdiction); *United States v. Abouselman*, 976 F.3d 1146, 1156 (10th Cir. 2020) (addressing "whether [aboriginal water] rights were extinguished"); *Seneca Nation of Indians v. New York*, 206 F. Supp. 2d 448, 518 (W.D.N.Y. 2002) (discussing effect of undisputed extinguishment by treaty). Indeed, even Jemez Pueblo recognizes that circumstances besides extinguishment and abandonment may trigger loss: When moving for reconsideration below, it acknowledged that at least some form of adverse tribal use (namely, "conquest . . . by another tribe") may also result in loss. App. vol. 5, 875. And *Wichita Tribe* makes clear that other forms of nonexclusive use—such as "shar[ing]" an area "without the[] consent" of the claimant tribe—have the same effect. *See* 696 F.2d at 1381; *see also id.* at 1385 (clarifying that other tribes' "continuous[] wander[ing]" through claimant tribe's land could "disrupt[] the [claimant tribe's] exclusivity of use"). Thus, I reject the majority's premise that any aboriginal title Jemez Pueblo may have obtained could be lost only by extinguishment or abandonment.

and occupancy of the claimed area "for a long time" *at any time* dating back to time immemorial. Here, that period of time was from 1300 to 1650, when the district court found that the Jemez Pueblo had actual, exclusive, and continuous use and occupancy of Banco Bonito. According to the majority, the district court should have stopped there and not considered the undisputed evidence that, for the next 350 years, Jemez Pueblo no longer had exclusive possession because other tribes roamed through and used the area just as Jemez Pueblo did. But to my knowledge, no court has ever held—and the majority cites no case holding—that the period of exclusive and continuous use and occupancy necessary to show aboriginal title need not be tethered to the relevant claim. Here, the Jemez Pueblo seeks to quiet title to Banco Bonito under the QTA based on Congress' creation of the Preserve in 2000. Thus, it is elemental that Pueblo Jemez must show, and the court must assess, exclusivity of the claimed area for a long time *prior to 2000* when the alleged interference began—not for a long time *prior to 1650*.[6]

---

[6] Contrary to the majority's suggestion, there is nothing "unjust" about considering the entire historical picture rather than a snapshot of it. Maj. Op. 24. The majority's hypothetical about Tribes X and Z illustrates why. The hypothetical supposes that after Tribe X acquires aboriginal title to a tract by using it exclusively for 200 years, Tribe Z adversely uses the tract for just two years. No injustice results from that scenario because under the cases cited in *Jemez I* and discussed above, Tribe Z's two years of adverse use—unlike the centuries of adverse use in Banco Bonito that the district court found here—would not disrupt the exclusivity of Tribe X's use. *See Wichita Tribe*, 696 F.2d at 1384–85 (rejecting conclusion that adverse tribe's "sporadic attacks" disrupted claimant tribe's use; noting instead that "[l]ands *continuously* wandered over by adverse tribes" may disrupt aboriginal title (emphasis added)); *Zuni Tribe*, 12 Cl. Ct. at 641 (rejecting argument that other tribes' use "detract[ed] from the exclusivity of the [claimant tribe's] use" in part because such adverse use was "for brief . . . periods of time").

Moreover, untethering the exclusivity analysis from the relevant time period, as the majority does, offends basic aboriginal-title principles. Courts have long recognized that "in the course of years, and especially during the early years of the United States, the use and occupancy of land by Indian tribes changed continuously." *Sac & Fox Tribe of Indians of Okl. v. United States*, 383 F.2d 991, 998 (Ct. Cl. 1967); *see also id.* (explaining that this change resulted from new tribes emerging and old ones disappearing or moving, from tribes exchanging land, and from tribes acquiring land from each other by conquest). Nowhere is this historical reality clearer than in the Valles Caldera. As the district court extensively discussed, this area is surrounded by more than a dozen tribes and situated near three others, all of which have used or occupied the area at various times since the early 1200s. And significantly, after 1650—the date on which the majority fixes its analysis—these tribes' use of the Valles Caldera fundamentally changed. Most relevant here, after that date, the members of Jemez Pueblo were no longer the sole occupants and users of Banco Bonito: Jemez Pueblo's farming of the area largely or entirely ceased, and other tribes traveled through the area to reach other parts of the Valles Caldera. What's more, Jemez Pueblo's ability to control other tribes' use was significantly if not entirely diminished by its forced removal to a location 15 miles south of Banco Bonito. The majority treats these historical realities as irrelevant, instead selectively focusing on a snapshot of events hundreds of years earlier. But by simply ignoring the "considerable change" in the Valles Caldera over many centuries and effectively "freez[ing]" Jemez Pueblo's aboriginal use as of 1650, the majority fails to apply a

8

fundamental concept of aboriginal law—that over the course of years, use and occupancy by Indian tribes changes frequently. *Sac & Fox*, 383 F.2d at 998–99.

Finally, the majority's snapshot in-time approach to exclusivity could subject the government to countless new aboriginal-title claims. Utilizing that approach, for example, Zia Pueblo would have had an equally strong quiet-title claim here based on its use of the Valles Caldera (including Banco Bonito) before the Jemez Pueblo ever arrived in the area. After all, the district court found that Zia Pueblo's use began decades before Jemez Pueblo arrived in the late 1200s or early 1300s, which is likely long enough to acquire aboriginal title.[7] *See Alabama-Coushatta Tribe*, 2000 WL 1013532, at *39–42 (holding that use for 30 years is sufficient to establish aboriginal title); *United States v. Seminole Indians of Fla.*, 180 Ct. Cl. 375, 387 (1967) (holding that use for "more than 50 years" is sufficient). Moreover, the district court also found Zia Pueblo's use has continued to the present day.

And there is no reason tribes nationwide could not file similar claims seeking aboriginal title to lands within the 18 other national preserves scattered throughout the United States or, for that matter, to any lands owned or later acquired by the government. *See* National Park Service, *About Us* (last updated Jan. 30, 2023),

---

[7] When confronted with this possibility, the majority assures that "whether a [t]ribe was the first occupant of certain land is ultimately irrelevant to whether the [t]ribe established aboriginal title to the land." Maj. Op. 26 n.17 (quoting App. vol. 6, 186 n.85). I agree that first use of an area *should* be irrelevant to the analysis. The problem is that under the majority's approach, such use *becomes* relevant; tribes like Zia Pueblo who used an area first may now claim aboriginal title so long as their use continued in some form and no extinguishment has occurred.

9

https://www.nps.gov/aboutus/national-park-system.htm. Under the majority's analysis, so long as those tribes exclusively used an area during some prior historical era and their use has continued in some form, they may now assert aboriginal title—even if their use has not been exclusive for hundreds of years. Rather than open the door to quiet-title claims based on tribal use of land that has not been exclusive for centuries, I would hold that Jemez Pueblo cannot assert aboriginal title.

**Conclusion**

Because it has been more than 350 years since Jemez Pueblo had exclusive use of Banco Bonito, the district court rightly determined that Jemez Pueblo failed to establish that it held aboriginal title in 2000 when the government allegedly interfered with that use. I would affirm the district court's rejection of Jemez Pueblo's Banco Bonito claim.

No. 20-2145, *Pueblo of Jemez v. United States, et al.*

**EID**, J., concurring in part and dissenting in part.

I join the majority opinion with respect to the Pueblo of Jemez's claim to Banco Bonito, but I disagree with how it analyzes the Paramount Shrine Lands claim. In my view, the district court erred by refusing to consider, on notice grounds, whether Jemez holds aboriginal title to discrete subareas of the Valles Caldera like the Paramount Shrine Lands. I would also reverse the district court's alternative holding that Jemez could only establish aboriginal title to the Paramount Shrine Lands by demonstrating the ability to exclude other tribes from those lands' indeterminate surroundings. Like the district court's treatment of Banco Bonito, its alternative holding regarding the Paramount Shrine lands imposed a made-up requirement that subverts aboriginal title law. Accordingly, I respectfully dissent from Part IV of the majority opinion.

## I.

The district court erred by refusing to analyze Jemez's claim to the Paramount Shrine Lands subarea on reconsideration. The district court held that Jemez's subarea claims (other than Banco Bonito) should have been raised at an earlier stage in the litigation, as the government was not on notice of them when Jemez moved for reconsideration. I think reversal is inescapable. The government was on notice of Jemez's claim to the Valles Caldera, so it was plainly on notice of Jemez's claim to any and all of the Valles Caldera's subareas. Although a Rule 59(e) motion is subject to deferential abuse of discretion review, a district court abuses its discretion where it makes an error of law or renders a "manifestly unreasonable" ruling. *See* maj. op. at 14 (quoting

*Eaton v. Pacheco*, 931 F.3d 1009, 1027 (10th Cir. 2019)).  In my view, when taking into account the stakes and nature of this land dispute, it was both legal error and manifestly unreasonable to refuse to assess Jemez's claim of aboriginal title to discrete subareas after its original claim had been rejected.  I would hold that the district court abused its discretion and reverse.

Recognizing, as we must, that we are dealing with a complex legal and factual dispute about whether aboriginal title existed—and, if so, to what extent—in the Valles Caldera, I find it untenable to conclude that Jemez was somehow prevented from seeking to confirm its aboriginal title to what everyone agrees is a subset of the initial claim area.  If anything, it was incumbent upon the district court to refine its sense of non-exclusivity in its post-trial opinion to ensure that Jemez's potentially valid aboriginal title to any subareas was not jeopardized by a finding of Valles Caldera–wide non-exclusivity.  If either party or the district court viewed the trial record as insufficient to resolve Jemez's subarea claims, the district court could have held further proceedings focusing on the subareas in particular—as the district court itself suggested.  *See* Aplt. App'x Vol. VIII at 1480.  The fact that the parties have spent seven years litigating this dispute weighs in favor of getting it right, not taking a shortcut.

As the majority recounts, Jemez initially claimed the entire Valles Caldera, and the district court rejected that claim after a twenty-one-day trial because of Jemez's nonexclusive use of the entire Valles Caldera.  But, as Jemez suggested in moving for reconsideration, the rational follow-up question concerns the geographic scope of the district court's dispositive exclusivity finding.  Indeed, the district court seemed to

2

envision precisely this kind of partial resolution in the conclusions of law it entered after trial, where it stated that "a court may find that a claimant Tribe had exclusive use of certain portions of the claim area[] but failed to prove exclusive use of other portions." Aplt. App'x Vol. IV at 789; *see also* Aplt. App'x Vol. VIII at 1477 (government acknowledging the same but arguing not on the facts of this case). If the district court was unable or unwilling to clarify the scope of its exclusivity finding unprompted, the best way to determine it within the confines of this litigation would have been to motion the district court to reconsider whether Jemez had aboriginal title to a smaller portion of the Valles Caldera. That is exactly what Jemez did here. The majority is untroubled by the district court's ruling. I would hold that reconsideration was required.

The majority, the district court, and the government all seem to expect Jemez to have pleaded, in the infinite alternative, every possible permutation of land claim in light of every possible permutation of responses by the district court. *See* maj. op. at 33; Aplt. App'x Vol. VI at 1150; Aple. U.S. Br. at 49. But that cannot be the solution. As Jemez rightly observes, such a system "would be impractical if not impossible to implement." Reply Br. at 15. From a notice perspective, I think Jemez's claim to the Valles Caldera necessarily included all its subareas. That reading follows from Jemez's complaint, which sought to quiet aboriginal title to "*the lands of* the Valles Caldera National Preserve." Aplt. App'x Vol. I at 62 (emphasis added). It would be nonsensical for Jemez to have to anticipate every single possible alternative ruling the district court might make regarding those lands just to preserve its ability to quiet title to parcels already encompassed within the initial claimed area. Rather, it was both expedient and efficient

3

from a judicial economy perspective for Jemez to proceed precisely as it did here—that is, to accept the district court's ruling with respect to the original claim and try to understand what subsets, if any, survived it. The notion that Jemez's aboriginal title claim to the Valles Caldera was an all-or-nothing proposition is fundamentally inconsistent with basic remedial principles. *See* Fed. R. Civ. P. 54(c) ("[F]inal judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."). The government was therefore on notice of Jemez's subarea claims by virtue of its Valles Caldera claim.

The government's suggestion that Jemez was "chang[ing] strategy after trial and an unfavorable decision," Aple. U.S. Br. at 49, is the wrong framing here. Rather, Jemez accepted the district court's finding that it lacked aboriginal title to the entire Valles Caldera and sought to quiet title to specified subareas based on arguable claims to aboriginal title that were no less legitimate after the district court's post-trial ruling. Jemez *had* argued for title to the subparts of the Valles Caldera because an argument for all "lands of the Valles Caldera National Preserve" was an argument for its subparts. Aplt. App'x Vol. I at 62. Reconsideration of those subarea land claims was essential, and the government was on clear notice of Jemez's asserted interest in all lands encompassing the Valles Caldera from the moment Jemez filed suit. The district court therefore abused its discretion by reasoning around the problems with its initial order's wholesale dismissal of Jemez's claim.

It is true that a district court has broad discretion to manage proceedings before it, but some choices are off-limits. In my view, the district court could have either analyzed

4

the subarea claims based on the trial record or held further proceedings to provide a factual basis for deciding those claims. It should have done so sua sponte after trial and, if not, done so in response to Jemez's motion for reconsideration. What the district court could not do, however, is what it did here: decline to decide those claims entirely on notice grounds. It is undisputed that the Paramount Shrine Lands fall within the territory sought in the complaint. The district court's conclusion on notice—much like its simultaneous decision on Banco Bonito, which the court correctly reverses today—is "altogether unjust." *See* maj. op. at 24. It was both legal error and manifestly unreasonable. But the majority opinion endorses it anyway. I would not. I would hold that the district court's decision "'exceeded the bounds of permissible choice,' given the facts and the applicable law in the case at hand," and was thus an abuse of discretion. *United States v. McComb*, 519 F.3d 1049, 1053 (10th Cir. 2007) (quoting *United States v. Ortiz*, 804 F.2d 1161, 1164 n.2 (10th Cir. 1986)).

## II.

The district court alternatively held that the Paramount Shrine Lands claim failed because aboriginal title respecting "such minute areas" would require an additional showing of Jemez's ability to exclude other tribes from those areas' surroundings. Aplt. App'x Vol. VI at 1157. The majority expresses "no opinion" on this issue. *See* maj. op. at 33. However, the majority's thorough discussion of Banco Bonito—which I join in full—would compel reversal if we reached the district court's alternative ground. I would reach and reverse this holding as well.

5

As a doctrinal matter, the district court's authorities do not support its "belie[f] that to establish aboriginal title to a discrete geographic feature, such as a shrine, spring, or trail, a Tribe must prove that it had the ability, if it wished, to exclude local, adverse Tribes from the surrounding land or from the feature itself if there is evidence of other Tribes in the vicinity." Aplt. App'x Vol. VI at 1157. Indeed, the district court forthrightly acknowledged that "no case deals with aboriginal title to such minute areas" but claimed to find support for its proposition anyway. *Id.* In my view, that support was illusory, and the resulting "belief" was both ill-advised and needlessly detrimental to aboriginal title claims. The district court's authorities merely restate the general principle, with which neither I nor the majority quarrel, that a tribe establishing aboriginal title must demonstrate its ability to exclude other tribes *from the interest claimed*. *See, e.g.*, *Strong v. United States*, 518 F.2d 556, 561 (Ct. Cl. 1975) ("Certainly, one of the primary characteristics of ownership is the desire and ability to exclude others from the area over which ownership is claimed."); *see also* Aplt. App'x Vol. VI at 1158 (district court relying on *Strong*). The district court's cases simply do not support a leap from (1) demonstrating exclusivity with respect to the land claimed to (2) demonstrating exclusivity with respect to land *surrounding* the land claimed. Aside from the lack of a doctrinal basis for the latter showing, it is worth noting that the former is bounded and straightforward, while the latter is open-ended and imprecise. Besides, as Jemez observes, "Anglo-American property law" does not typically feature "a minimum size . . . for recognition of interests in real property." Aplt. Br. at 42. It is unclear why such a requirement would arise in this context.

6

Placing new legal obstacles in the way of Jemez's ability to demonstrate aboriginal title was error with respect to the Paramount Shrine Lands just as it was error with respect to Banco Bonito. In both instances, the district court lacked doctrinal support and discarded core principles that underlay this area of law. Where a tribe has shown continuous and exclusive possession of real property for a long time sufficient to establish aboriginal title and where its property interest has been neither extinguished nor abandoned, it is unclear why an aboriginal title claim would fail or face additional constraints simply because the relevant property was small—whatever that means. As the majority explains, a successful Quiet Title Act claim based on aboriginal title requires two showings: that a tribe once held aboriginal title and that it continues to hold aboriginal title. *See* maj. op. at 20. Just as our cases say nothing about a "continuing-exclusivity requirement," *id.* at 23, they say nothing about a minimum size to avoid triggering a requirement to prove exclusivity with respect to surrounding lands. Aside from the lack of legal support for the new barrier interposed by the district court, the absence of any obvious cutoff point for when a claimed area is large enough to be assessed on its own terms—as the district court did with Banco Bonito, for example— makes the district court's approach puzzling. The scope of the relevant surroundings is likewise unclear.

Privileging a new criterion like size seems especially inappropriate where Jemez derives religious significance from the property at issue—notwithstanding the government's suggestion at oral argument that a claim to the Paramount Shrine Lands is like a claim to a chair in a law school classroom. *See* Oral Arg. at 46:05–46:41. The trial

7

record is replete with evidence of the historic and continuing significance of the Paramount Shrine Lands to Jemez. *See, e.g.*, Aplt. App'x Vol. III at 551. Their importance deftly illustrates some of the problems with the novel legal impediment the district court devised as an alternative ground for denying Jemez's claim. In effect, the district court told Jemez that, however integral the Paramount Shrine Lands may be to the Jemez community, they could not be the subject of an aboriginal title claim without proof that Jemez could exclude other groups from Redondo, which is a site of significance to numerous other tribes.

I would not adopt a rule so contrary to tribal land claims with so few concrete parameters and so little doctrinal basis. It bears repeating that the majority does not adopt such a rule today either. *See* maj. op. at 33. I see no reason Jemez should be precluded from quieting its aboriginal title to a smaller area of land unless it can demonstrate title to the surrounding areas. As with any aboriginal title claim, Jemez must still prove actual, exclusive, and continuous use and occupancy, for a long time, with respect to the claimed land itself. *See Pueblo of Jemez v. United States* (*Jemez I*), 790 F.3d 1143, 1165 (10th Cir. 2015). The government's arguments about the evidentiary difficulties it might face in countering aboriginal title suits involving smaller parcels of land, *see* Aple. U.S. Br. at 53, is unpersuasive because the tribal claim at issue would face the same constraints. There is no presumption of aboriginal title; the burden remains on the plaintiff tribe to demonstrate it has satisfied the relevant doctrinal requirements for the parcel in question. *See Jemez I*, 790 F.3d at 1165–66. But the plaintiff tribe's burden is always limited to the parcel in question. I would hold that the district court erred by holding otherwise.

8

**III.**

I would reverse the district court with respect to the aforementioned legal obstacles that guided its rejection of Jemez's claim to the Paramount Shrine Lands. However, I would go no further. The parties argue the merits of the Paramount Shrine Lands claim on appeal to a certain extent, but aboriginal title is a question of fact. *See id.* at 1165; maj. op. at 14. Without a factual finding under the right legal framework that can be reviewed on appeal for clear error, I would not usurp the district court's critical factfinding role. Instead, I would remand Jemez's Paramount Shrine Lands claim for evaluation consistent with my position discussed above and with the majority opinion's resolution of the Banco Bonito issue. For the foregoing reasons, I respectfully concur in part and dissent in part.

9